FRANK FAGIANO, Appellant, *v.* THE POLICE BOARD OF THE CITY OF CHICAGO *et al.*, Appellees.
RICHARD W. BASTIAN *et al.*, Appellees, *v.* PERSONNEL BOARD OF THE CITY OF CHICAGO *et al.*, Appellants.

First District (5th Division) Nos. 80—3010, 81—0569, 81—0863, 81—1060 cons.

Opinion filed April 27, 1984.

John D. Moss, of Chicago, for appellant Frank Fagiano.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Mary K. Rochford, Assistant Corporation Counsel, of counsel), for the City of Chicago.

Ditkowsky & Contorer, of Chicago (Kenneth K. Ditkowsky, of counsel), for appellee Richard W. Bastian.

Epton, Mullin, Segal & Druth, Ltd., of Chicago (Saul A. Epton and Gerald B. Mullin, of counsel), for appellee Norman C. Byttow.

Rick Allen White, of Chicago, for appellee John Green.

JUSTICE WILSON delivered the opinion of the court:

Fagiano, Bastian, Byttow and Green (employees), career service employees of the city of Chicago (the city), were discharged from employment following separate hearings before either the city police board (Fagiano) or the city personnel board (Bastian, Byttow and Green) regarding alleged violations of certain departmental rules predicated upon the city's residency requirement (Chicago Municipal Code (1977), ch. 25, sec. 30), which requires that "[a]ll officers and employees in the classified civil service of the City shall be actual residents of the City." The circuit court granted the employees' individual petitions for writ of certiorari requesting administrative review and, following arguments by each, entered orders sustaining Fagiano's dismissal and reversing the dismissals of Bastian, Byttow and Green.[1]

---

[1]Although each employee presented separate and independent arguments before the circuit court, each was fundamentally similar in that they were argued before the same judge and all claimed that the respective board's decision was against the manifest weight of the evidence and, in the alternative, that the residency requirement was unconstitutionally vague and, thus, unenforceable. Fagiano's case was the first to be heard and an order was entered August 22, 1980, reversing several of the board's

On appeal, this court affirmed the circuit court's finding of unconstitutionality in the consolidated case of *Bastian v. Personnel Board* (1982), 108 Ill. App. 3d 672, 439 N.E.2d 142, and, reversed the judgment of the circuit court as to Fagiano on the same ground of unconstitutionality. (*Fagiano v. Police Board* (1982), 108 Ill. App. 3d 1205 (Rule 23 order.)[2] Pursuant to Supreme Court Rule 315 (87 Ill. 2d R. 315), the Illinois Supreme Court granted the boards' petitions for leave to appeal and the motion to consolidate both decisions. Confronted solely with the constitutionality issue, the supreme court held that the residency requirement was not unconstitutionally vague, and, accordingly, vacated the judgments of the appellate court and remanded the cause to the appellate court for consideration of those issues not reached on the original appeals. *Fagiano v. Police Board* (1983), 98 Ill. 2d 277, 456 N.E.2d 27.

On remand, the following issues are before this court: (1) each employee contends that the decisions of the boards were contrary to the manifest weight of the evidence; (2) Fagiano further claims that: (a) he was found guilty of the wrong charge by the police board; (b) the circuit court's findings were prejudicially inconsistent; and (c) the hearing officer erred in granting improper continuances which prejudiced his procedural due process rights; (3) Bastian further claims that: (a) he was denied his right to procedural due process during the hearing; and (b) a domicile requires more than the observance of an

---

findings, yet sustaining Fagiano's dismissal based on his violation of Rule 23 for failure to report secondary employment and his violation of Rule 25 for failure to actually reside within the city of Chicago. Fagiano's motion for a rehearing was denied on October 21, 1980.

Similarly, in orders entered on January 9, 1981, and on January 19, 1981, respectively, the circuit court affirmed the personnel board's dismissal of Green and Byttow. Less than one month later, in entering judgment as to Bastian, the circuit court deviated from its previous findings and found that the residency requirement's term "actual residence" is unconstitutionally vague. Based upon the *Bastian* decision, the circuit court granted Byttow's and Green's motions for reconsideration and vacated the January 9, 1981, and January 19, 1981, orders, reversed the board's decision in each case, and ordered that, if appealed, *Byttow* and *Green* should be consolidated with *Bastian*. In addition, the circuit court noted that its decisions to reverse were based on the issue of unconstitutionality only and that it found the personnel board's decisions not to have been contrary to the manifest weight of the evidence.

[2]In Bastian, this court also affirmed the trial court's refusal to grant attorney fees to Bastian pursuant to section 1988 of the United States Code. (42 U.S.C. sec. 1988 (1976).) In *Fagiano*, this court further held that because Fagiano's business partner and fellow policeman received only a one-day suspension for failing to report his secondary employment in violation of Chicago police department Rule 23, it was error to discharge Fagiano for violation of the same rule.

individual in a suburban community; and (4) Byttow further claims that the personnel board's order of discharge is invalid on the ground that it is void of findings of fact and articulated standards of proof. For the reasons that follow, we affirm the decisions of the police board and personnel board, affirm the judgment of the circuit court as to Fagiano, and reverse the judgment of the circuit court as to Bastian, Byttow and Green.

### a. FRANK FAGIANO

Effective October 27, 1978, Frank Fagiano, Chicago police officer, was suspended from the police department for a minimum of 30 days after a determination by the superintendent of police that he had violated certain departmental rules, including the requirement "to actually reside within the corporate boundaries of the City of Chicago." (Rule 25.) Following the initial determination, charges were filed with the police board after which a hearing was conducted during which both sides were represented by counsel. At the hearing, Fagiano testified that since his remarriage in 1975 to the present, he and his wife have changed rental residences in Chicago eight times. In March 1975, Fagiano sublet his apartment on Elm Street to Janet Schart, a co-worker of his wife's. At that time, Schart helped move some of their clothing and personal belongings to Fagiano's parents' home in Bensenville. Shortly thereafter, on May 1, 1975, Fagiano moved to 2538 West Belmont where he lived for a few months behind a sandwich shop that he owned and operated in partnership with a fellow police officer. On August 30, 1975, Fagiano moved to a three-flat building owned by his in-laws on Winchester. Approximately two months later, he moved to a building on Superior where he leased an apartment from the parents of his business partner. In March 1976, Fagiano moved back to the Winchester building owned by his in-laws. A few months later, in July 1976, he moved again to an apartment on Clarendon where he remained for approximately three months, after which he moved to Wrightwood where he and his wife shared an apartment with his wife's girlfriend and the girlfriend's son. Four months later, Fagiano moved back to his in-law's building on Winchester. Evidence revealed that at all of the aforementioned addresses, the lease and utility bills were in Fagiano's name.

Fagiano's parents purchased their home in Bensenville in 1969 and hold title in joint tenancy. All utilities for the Bensneville residence are in the father's name. From 1975 to the present, Fagiano has regularly visited his parents' home three or four times per week, and he and his wife have stayed overnight there as often as possible.

Occasionally, Fagiano leaves for work directly from the Bensenville residence. Fagiano's three children from his first marriage reside in Melrose Park with their mother and visit Fagiano at the Bensenville residence. Because he moves so frequently, Fagiano uses the Bensenville address as his mailing address.

Janet Schart testified that she has visited Fagiano and his wife at the Bensenville residence three or four times. On cross-examination, Schart admitted that she had purchased furniture from Fagiano and that there remains a controversy as to the amount due and owing which has resulted in a bitter feud between Schart and the Fagianos. In February 1976, Schart wrote the letter to the internal affairs division of the Chicago police department which notified them of Fagiano's alleged violation of the residency requirement. When no action was taken immediately, she wrote a follow-up letter in January 1977. Fagiano presented an offer of proof intended to impeach Schart's credibility and both Fagiano and his wife testified as to Schart's bad reputation for truth and veracity.

Joanna Fitzgerald, former co-worker of Mrs. Fagiano, testified that when she visited the Bensenville residence with Mrs. Fagiano in August 1975, she observed clothing belonging to Fagiano and his wife, including a police officer's uniform. On cross-examination, Fitzgerald stated that she and Mrs. Fagiano had had an altercation and were no longer friends. She was, however, a friend of Janet Schart. Both Fagiano and his wife testified as to Fitzgerald's bad reputation for truth and veracity.

Leroy Dorff and Paul Bendis, Chicago police officers, testified that during their surveillances of the Bensenville address, they had observed Fagiano leaving the residence on three separate occasions in an automobile registered to him. Two of the surveillances had been made in the early morning hours on days that Fagiano was on duty. The third surveillance had been made in the afternoon. The record is unclear as to whether Fagiano had been on duty the day of the third surveillance. On a separate occasion, in February 1977, Officer Bendis and another officer accompanied Fagiano to his alleged residence on Wrightwood in order to view the premises. Although the apartment appeared to be lived in, Fagiano had no police uniforms there, and, with the exception of one pair of blue jeans on the bed, had no civilian clothing in the apartment.

## b. RICHARD W. BASTIAN

Bastian, a career service firefighter employed by the Chicago fire department, was charged with violating the residency requirement

and certain rules and regulations of the Chicago fire department "in that on or about September 19, 1979, and prior thereto, he was not an actual resident of Chicago."

At the personnel board hearing, Bastian testified that in 1969 he built a house in Niles as a business venture. He and his estranged wife still hold title to the house as joint tenants. Shortly after the house was built, Bastian and his wife unofficially separated, and were legally separated six years later. Mrs. Bastian and their four children have remained in the Niles residence while Bastian has rented apartments in Chicago, most recently on Lincoln Avenue. Mrs. Bastian is unemployed and Bastian pays all maintenance costs, taxes and mortgage payments on the Niles residence. He and his wife file joint tax returns. The Bastian children either attended or still attend Niles schools. Bastian admitted to staying overnight in Niles on occasion, but had no idea how often he had done so. Approximately one week prior to the hearing, Bastian and his wife reconciled and moved together to an apartment on East River Road in Chicago. Those children not currently in college continue to reside in the Niles home. Bastian's automobile is registered in Chicago, he banks and last voted in Chicago, and has phone bills, credit cards, and insurance policies in his name which all bear a Chicago address.

Thomas Pleines, investigator for the Chicago fire department, testified that he had conducted early morning residency surveillances of the Niles residence on three separate days that Bastian was scheduled to be on duty. On one occasion, Pleines had observed Bastian leaving the Niles residence in a brown Datsun. On another occasion, when the Datsun was parked one block over from the Niles residence, he observed Bastian cut through the back yards from the direction of the Niles residence, enter the car and drive away. On the third occasion, Pleines had observed Bastian driving out of the Niles driveway. Within a week or two of the surveillances, Pleines had conducted a canvas of the Niles neighborhood at which time he talked with several of the neighbors. Three neighbors had recognized a photograph of Bastian, and two of the three had indicated where he lived.

Edmund Beauregard, investigator in the internal affairs division of the Chicago fire department, stated that, pursuant to information gleaned from Bastian's personnel file, the 1978 real estate tax bill on the Niles residence was in Bastian's name, the Niles phone number is listed in Mrs. Bastian's name, and Bastian's Datsun is registered to him at the Lincoln Avenue address. Beauregard also testified that on four separate occasions, while conducting early morning residence surveillances of the Niles address, he had observed Bastian leave the

house and drive away in the Datsun. It was later verified that Bastian was at work on those days. On a fifth occasion, Beauregard had observed Bastian leave the Niles residence at 6:20 a.m. and proceed to load the hatchback. Beauregard never observed the Lincoln Avenue address.

Captain James J. Ryan, Director of the Bureau of Inspectional Services for the Chicago fire department, testified that he had conducted early morning residency surveillances at the Lincoln Avenue address on two occasions and had never observed Bastian enter or leave the building. It was later verified that Bastian had been at work those days.

Marion Bastian, plaintiff's wife, testified that, pursuant to the separation decree, Bastian is obligated to maintain the Niles residence and to pay all expenses. However, the utility bills are in her name only. Mrs. Bastian stated that plaintiff did not have a key to the residence and had not stayed overnight during the period from January to September 1979. She recalled telephoning her husband in the early morning on occasion to ask him to stop by to repair something. However, she did not recall how often she had made such requests, or at what time.

In support of his motion to dismiss at the conclusion of the city's case, Bastian attached 25 affidavits, all allegedly attesting to the fact that he resided at the Lincoln Avenue address. The affidavits were form documents on which the affiants circled those statements to which they could swear and then signed the documents. Pursuant to the affidavits, each affiant stated that: (a) he was duly sworn; (b) he had personal knowledge of Bastian's domicile on Lincoln Avenue in Chicago, which knowledge was obtained by personally visiting him, by being aware of where he voted, and by seeing his personal check; and (c) Bastian was separated and living apart from his wife. However, when the affiants testified at the hearing, it was revealed that none of them had been duly sworn or had had their signatures properly notarized, that only five had actually been inside Bastian's apartment, only four had ever seen Bastian's personal checks, and none had personal knowledge as to where Bastian voted.

c. NORMAN C. BYTTOW

Byttow, fire engineer for the Chicago fire department, was charged with violating the residency requirement as well as related Chicago fire department rules and regulations "in that on or about September 4, 1979, he was not an actual resident of the City of Chicago."

At the personnel board hearing, Byttow testified that he owns and resides in a four-flat on Langley Avenue in Chicago that he had purchased in joint tenancy with his wife and another couple, the Hameetmans, in 1964. Before retiring from his job as a Chicago firefighter, Hameetman had shared the same unit in the four-flat with Byttow. The wife and children of both Hameetman and Byttow lived in the suburbs. When Hameetman retired, he sold his interest in the four-flat to another firefighter and joined his wife and children in Peotone. In 1969, Byttow and his wife, as joint tenants, purchased a home in Dolton, Illinois. Byttow never "fully" moved into the Dolton residence, but lived "between" his Chicago address and the Dolton residence until he and his wife were separated in 1974.

Byttow's three children and his estranged wife currently reside in Dolton. All of the Byttow children either attended or still attend Dolton-area schools. Although his wife works as an automobile salesperson, Byttow pays her $500 per month plus he pays the mortgage, all household maintenance costs and all other bills. In addition to his firefighting duties, Byttow is self-employed as a carpenter and maintains his business office at the Dolton address. The business office has a separate entrance and is equipped with its own washroom, bar and daybed. Because his office is in Dolton, Byttow can be found at the Dolton residence at various times. He often drives to the office as early as 5:30 or 6 a.m. to pick up supplies or to do paper work before starting his firefighter job. On or about September 4, 1979, he was at the Dolton address nearly every day because of a big remodeling job on which he was working. Byttow estimated that he had spent an average of two hours per day, five days per week, at his Dolton office in September 1979. Further, when his wife worked late, he would stay and watch television with the kids. Byttow has free access to the house and leaves his laundry there for his daughter to wash.

Byttow owns several cars and a van, all of which are registered to the Chicago address. He keeps most of his carpentry tools in the van and parks it in the driveway of the Dolton residence when he is there. Operating and maintenance costs of the four-flat building are split between the owners. Byttow's driver's license, voter's card and his personal checking account all bear the Chicago address, while his business account and business phone are registered to the Dolton address. The business phone can be answered anywhere in the residence. Byttow further indicated that when he is on duty (nine days per month), he sleeps at the firehouse.

Donald McGreal, Chicago fire department investigator for internal affairs, testified that he had conducted a surveillance of the Dolton

address on eight occasions. Two of the surveillances had taken place approximately midnight or shortly thereafter, at which times he had observed Byttow's van parked in the driveway, and his Ford Mustangs parked in front of the house. When McGreal returned later in the morning on those two days as well as on four other mornings, he saw Byttow leave the residence in the van approximately 7 a.m. It was later verified that Byttow had been at work on those days. McGreal never conducted a surveillance at the Chicago address.

In October 1979, when McGreal conducted a resident canvas of the Dolton neighborhood, five of the neighbors identified Byttow's photograph. Two of the five would not indicate whether he lived in the Dolton residence, two indicated that he did, and the· record is unclear as to what, if anything, the fifth indicated. In May 1979, McGreal conducted a canvas of the Chicago building. Of the two mailboxes at the building, one had the names, "Hameetman, Byttow and Janusz," on it; the other had no name on it. McGreal spoke with one tenant who did not know Byttow and who, in fact, said that no one lived in the apartment that Byttow claimed to occupy. The neighborhood was run-down and was primarily Spanish or Mexican.

William Rotlof, a civilian investigator for the Chicago police department, had conducted a residency canvas in Dolton in October 1979, at which time three neighbors had recognized Byttow's photograph and had said that he lived at the Dolton address.

In Byttow's behalf, Paul Potocki, self-employed construction worker; Robert Paholke, owner of a lounge which Byttow remodeled; Gordon Guntner, self-employed plumbing contractor; Roger Christ, self-employed cabinet maker; and Dominick Massoglia, Chicago firefighter, all testified that they had visited Byttow at his Chicago apartment on numerous occasions, and at various times of the day and night over the past few years, and that the Chicago address was his residence.

The aforementioned testimony concluded the April 1980 hearing. Following the personnel board's order that Byttow be discharged, Byttow filed a complaint for administrative review in the circuit court which resulted in the cause being remanded to the personnel board for an additional hearing. When the hearing resumed, Clarence Hameetman, retired Chicago firefighter and self-employed plumber, testified that he had lived at the Chicago address with Byttow for 10 years, until October 1978, when Hameetman retired from the fire department and joined his wife and children in Peotone.

Robert Suster and George Nolan, Chicago firefighters and self-employed contractors who have worked frequently with Byttow, testi-

fied that Byttow lived at the Chicago address for the period in question. Both stated that they had been inside his apartment. In addition, Jane May, a tenant at the Chicago address, and Byttow's two children testified that Byttow had lived at the Chicago address for the period in question.

d. JOHN GREEN

Green, an engineer technician for the Chicago water department, was charged with violating the residency requirement and certain personnel rules in that "on or about May 20, 1980, and prior thereto, he was not an actual resident of the City of Chicago."

At the personnel board hearing, Green testified that he moved to his current "hotel-type rooming house," located on Clark Street in Chicago in 1977, and, prior to that, had lived on Pine Grove in Chicago. His room is furnished with a bed, chairs and a dresser, but has no closet, washroom (washroom is in the hall), stove, refrigerator or telephone. Green separated from his wife, a registered nurse, in 1974 because she refused to live in Chicago. They were not legally separated until September 1976. In 1977, Green and his estranged wife, as joint tenants, purchased a home in Wheaton where Mrs. Green and their 10-year-old son currently reside. At the time that the house was purchased, Green lived there for a few weeks "until everything settled." Green helps with the yard work and general maintenance. He did not recall in whose name the Wheaton phone bill or utility bills are addressed. However, the real estate tax bill is in both names. The Greens file joint tax returns and receive refunds, if any, at the Wheaton address. In addition, joint credit cards are billed to the Wheaton address. Green has a checking and savings account at a Chicago bank and a joint account with his wife at a Wheaton bank. The two social clubs to which Green belongs are located in the south suburbs. Pursuant to the separation decree, Green is obligated to pay his wife $600 per month, but actually pays her more than this.

Green keeps half of his personal clothing at the Wheaton address, spends the Christmas holidays there, and eats dinner there with his son three or four times per week. During 1979, Green spent three or four nights in Wheaton and spent the entire first three months of 1980 there because of his wife's health problems. Green owns two cars, one jointly owned with his wife, the other owned solely by him. The latter has a Chicago vehicle sticker. The insurance bills for both cars are mailed to the Wheaton address and Mrs. Green pays the premiums with money given to her expressly for that purpose by Green.

Yvonne Green, Green's wife, testified that her husband stayed

overnight at the Wheaton residence whenever she had difficulty obtaining a sitter for their son who has minimal brain damage. Because she now works the 3 p.m. to 11 p.m. shift, Green sometimes prepares dinner for himself and their son, but does not spend the night.

Lydia Conlisk, residency investigator for the Chicago police department, testified that during the period from December 1979 through March 1980, she had conducted five separate early-morning surveillances of Green's alleged Chicago residence and six separate surveillances of his alleged Wheaton residence. While observing the Chicago residence, Conlisk had never seen Green enter or exit the building. It was later verified that he had been on duty on those days. By contrast, on each of the Wheaton surveillance dates, Conlisk had observed Green exit the Wheaton house approximately 7 a.m., enter his car and drive to the Chicago and Northwestern train station. A later verification on each of those days revealed that Green had been working. In addition, Conlisk had conducted a neighborhood canvas of each of the areas. The owner of the Clark Street building stated that Green had lived there for about five years, but that he had never seen Green. Conlisk further stated that the Wheaton utility bills were in Mrs. Green's name, Green's automobile was registered to him at the Clark Street address and Green was registered to vote in Chicago.

Opinion

I. Common Issue: Manifest Weight

■■ On appeal, each employee asserts that the board's decision to discharge was contrary to the manifest weight of the evidence. We disagree. It is well established that if there is any evidence in the record that supports an administrative agency's decision, that decision is not contrary to the manifest weight of the evidence and must be sustained on judicial review. (*Caldbeck v. Chicago Park District* (1981), 97 Ill. App. 3d 452, 458, 423 N.E.2d 230.) Moreover, it is particularly within the province of the administrative agency to resolve any factual conflict presented by the evidence and to determine the credibility of the witnesses. (*Schnulle v. Board of Fire & Police Commissioners* (1974), 16 Ill. App. 3d 812, 818, 306 N.E.2d 906.) Simply because a reviewing court finds that an opposite conclusion might be equally as reasonable or that it would have reached a different conclusion is not sufficient ground to set aside the agency's decision. (*O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 654, 456 N.E.2d 998.) To do so, the facts must indicate that an opposite conclusion is clearly evident. *Kelly v. Police Board* (1975), 25 Ill. App. 3d

559, 564, 323 N.E.2d 624.

In the present consolidated appeal, we find *Fagiano v. Police Board* (1983), 98 Ill. 2d 277, 456 N.E.2d 27, and *O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 456 N.E.2d 998, dispositive of the manifest weight issue. In *Fagiano*, the Illinois Supreme Court resolved a long-standing controversy and interpreted the term "actual residence," as used in the residency requirement, to be synonomous with "domicile," which it had earlier defined in *Peirce v. Peirce* (1942), 379 Ill. 185, 39 N.E.2d 990, as "the place where a person lives and has his true, permanent home, to which, whenever he is absent, he has an intention of returning." 379 Ill. 185, 192.

Shortly thereafter, confronted with a manifest weight issue and factual circumstances substantially similar to those before us now, the court in *O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 456 N.E.2d 998 began its analysis with the recent supreme court interpretation of "actual residence," and proceeded to analyze the applicable law governing domicile to determine whether the personnel board's decision was supported by the evidence. In affirming the board's decision, the *O'Boyle* court focused on the following legal principles: (1) a person can have only one domicile; (2) once a domicile is established, it continues until a new one is acquired; (3) there must be actual abandonment of a former domicile with no intent to return; and (4) the new domicile must be acquired with the intent of making it a true and permanent home. (119 Ill. App. 3d 648, 655.) The *O'Boyle* court further noted that the intent required to effect a change in domicile is generally absent in cases where civilian public employees are required to reside in a certain locale. 119 Ill. App. 3d 648, 656.

Applying the *O'Boyle* court analysis to the factual situations before us, we conclude that there was sufficient evidence to support the boards' determinations that none of the employees had abandoned his suburban domicile with the intent not to return, and none had acquired a new domicile in Chicago with the intent of making it a true and permanent home. Accordingly, we find that the boards' decisions were not against the manifest weight of the evidence.

## II. FAGIANO ONLY

In addition to his manifest weight argument, Fagiano contends that: (1) he was found guilty of the wrong charge by the police board; (2) the circuit court's findings were prejudicially inconsistent; and (3) the hearing officer improperly granted continuances.

In the formal notice of charges brought against Fagiano by the police department, dated October 26, 1978, Fagiano was charged with

violating, *inter alia*, Rules 2 and 25 of the Rules of Conduct of the Rules and Regulations of the Chicago police department.[3] Under the heading "Specifications," the notice set forth those specific acts which were found to have violated the various rules. With respect to Rule 2, a general misconduct rule, the specifications stated that Fagiano "has been actually residing since 1975 at 810 River Forest Drive Bensenville, Illinois." With the exception of the clause, "since 1975," the specification pertaining to Rule 25, the residency rule, was identical to that stated for Rule 2.

At the hearing, Fagiano moved to dismiss the Rule 25 charge on the ground that the absence of a time frame in the Rule 25 specification precluded him from preparing a proper defense. When reminded by the city that the specification for Rule 2 provided the necessary time frame, Fagiano's counsel retorted, "I'm not asking for the Rule 2 allegation to be dismissed. I'm asking for the allegation of violation of Rule 25 to be dismissed." The hearing officer agreed that there was insufficient specificity regarding the allegations relating to Rule 25 and, over Fagiano's objection, granted the city's motion to amend the pleadings to add "since 1975" to the Rule 25 specifications.

■ Subsequently, in the findings and decision of the police board, issued on March 28, 1979, the police board erroneously set forth the Rule 25 charge in its pre-amendment form, *i.e.*, without the clause "since 1975." The findings and decision did, however, include the Rule 2 charge which contained the appropriate time frame. Fagiano claims that, as a result of the police board's misstated Rule 25 finding, he was found guilty of the wrong charge. In our opinion, Fagiano's argument is an unpersuasive attempt to extol form over substance. Both the Rule 2 specifications and the amendment made to the Rule 25 specifications during the hearing sufficiently notified Fagiano of the charges and established the time frame. Although it is clear that the board did misstate the Rule 25 finding, the misstatement was nothing more than an inconsequential clerical error which did not prevent Fagiano from presenting a vigorous and thorough defense to the circuit court regarding the relevant time frame or prejudice him in any other way.

■ Fagiano next contends that the circuit court's findings were

---

[3] Rule 2—Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.

Rule 25—Failure to actually reside within the corporate boundaries of the city of Chicago.

prejudicially inconsistent in that the court reversed the board's Rule 2 finding and affirmed the Rule 25 finding. Fagiano argues that if he is not guilty of violating Rule 2, he cannot be guilty of violating Rule 25 which is grounded on the same act. Fagiano's untenable argument is the result of a serious misconception on his part that the reversal of a finding is synonomous with a determination of not guilty. To the contrary, absent an express determination of "not guilty," the effect of a court's reversal of a particular finding or allegation is to cancel or nullify the finding. It is not a determination of guilt or innocence of the charge. While the record is not clear as to the court's rationale for its findings, the law is clear that dismissal of the Rule 2 charges was not inconsistent with affirmance of the Rule 25 charge.

Finally, Fagiano contends that the numerous continuances granted by the hearing officer, over his objections, severely prejudiced him in preparing his defense and securing his witnesses. The record and briefs, however, are void of any explanation as to how he was actually prejudiced. Pursuant to the police board rules governing administrative hearing procedures, it is within the hearing officer's discretion to grant continuances. Upon reviewing the record, we find no abuse of that discretion. To the contrary, those continuances granted because of an overlooked court holiday, motions filed *instanter*, and insufficient paper for the court reporter's machine were unquestionably proper and in no way suggest dilatory or otherwise improper tactics. Accordingly, we affirm the judgment of the circuit court as to Frank Fagiano.

III. Bastian Only

In addition to the manifest weight issue, Bastian contends on appeal that: (1) he was denied a fair hearing; and (2) the term "domicile" must be more precisely defined.

Bastian claims that he was denied a fair hearing because of the "refusal of the defendants to produce their records, the destruction of notes, the rush to a hearing without giving the plaintiff adequate time to prepare, the blatant admission of unreliable hearsay from a witness who testified three times that he had no independent recollection (actually it was four times), and the rendering of decision on issues not presented in the tendered charges." We shall address these allegations in the order in which they are stated.

First, it is difficult to discern from Bastian's brief exactly what records and notes he is referring to in his allegation. We can only assume, based on his subsequent references to the fire department investigators, that he is referring to the preliminary notes taken

by the investigators during the Niles canvasses. At the hearing, Bastian placed great emphasis on the fact that, after dictating their final, signed reports from their notes, the investigators destroyed the notes according to standard departmental procedure. Apparently, Bastian does not consider the investigators' signed reports, transcribed and retained in the ordinary course of business, sufficient verification of the information gleaned from the neighbors during the canvas. We reach a different conclusion and find that the investigators' signed reports, which were readily accessible to Bastian, and were admitted into evidence during the hearing, were sufficient verification of the reliability of their testimony. Accordingly, we do not find that the absence of the investigators' preliminary notes denied Bastian a fair hearing.

■ We next address Bastian's contention that he was not given adequate time within which to prepare for the hearing. Preliminarily, we note that pursuant to section 8 of the Administrative Hearing Procedures of the personnel board of the city of Chicago, no more than 10 days is required from notice of charges to the date of the hearing. In Bastian's case, charges were filed on March 31, 1980, the hearing was originally scheduled for April 15, 1980, and continued to May 5, 1980, at Bastian's request. On May 5, Bastian filed a motion *instanter* to dismiss the charges, alleging that: (1) the charges were too vague to allow him to prepare his defense; and (2) the city was estopped from claiming that Bastian lives outside Chicago because the city mailed notice of the charges to Bastian at his Chicago address. After briefly addressing the elusive merits of the estoppel issue, the hearing officer explained that he did not have jurisdiction to decide a motion to dismiss. Rather, it was the personnel board's function. Thus, the hearing officer agreed to forward the motion to the personnel board for consideration, but declined to delay the hearing pending its decision.

Bastian then argued that he had been prejudiced by the city's failure to give him the home addresses of 11 of its witnesses. Instead, the city listed the fire department training school on DeKoven Street as the address for all 11. In this regard, Bastian's counsel stated, "I think we are entitled to a list of witnesses and we are entitled to be served with the documents, we are entitled to have some discovery." However, when queried by the hearing officer, Bastian's counsel admitted that he had not as yet filed a motion to produce, claiming that he did not know what discovery he would need until he received specific charges as to where and when Bastian was allegedly residing outside of Chicago. Bastian's counsel further admitted that he had

never tried to contact the 11 witnesses by mail at the address given, nor had he previously requested the city to supply their home addresses or telephone numbers. When reminded by the city that Bastian's co-counsel had been advised at the initial April 15 hearing to notify the city of any problems in proceeding with the hearing on May 5, Bastian's counsel stated that he was not aware of that conversation and that "[i]n any case, [he was] not prepared to go ahead" for the reasons already stated. He then reiterated his arguments set forth in his motion to dismiss regarding his failure to receive statements of the witnesses, a list of all witnesses with correct addresses, specific charges as to Bastian's out-of-Chicago address or subpoena forms. In response, the hearing officer observed that this request appeared to be a motion to produce, which ordinarily would be granted. However, in this case, the hearing had been continued from April 15 to May 5 at Bastian's request and the granting of that continuance carried with it a responsibility to request or demand production of documents or additional information during that three-week interim period. The hearing officer further explained that those arguments made in defense of the charges were more appropriately reserved for Bastian's case in chief. With regard to Bastian's argument that without the correct names and addresses of the witnesses he could not effectively investigate them, the hearing officer replied,

"Okay, if you are going to make a motion in terms of the significance of the addresses of the witnesses, based upon that to delay this trial, I'm going to overrule you on that motion.

* * *

If you have [the witnesses'] names and you have an address and that address happens to be the City residence or address at a facility that is in the City of Chicago, then the measurement of the propriety of that address is whether or not you can contact them there.

* * *

[T]he relevance is whether or not you, in fact attempted to contact those people using a reasonable procedure or whether or not you were unable to contact them by use of a mailing address is simply that you know something so you can mail and contact parties through the mail. In addition, you could go there on any given day. You could have gone there on any given day to find out if those persons were available for that time."

Consequently, because the hearing had already been delayed approximately 20 days and Bastian was making his first discovery re-

quest at the re-scheduled hearing,[4] the hearing officer ruled that the hearing would commence with the city's witnesses. However, Bastian was to have the opportunity to review whatever documents were presented and, if after the city's witnesses testified, Bastian found it necessary to subpoena additional witnesses, the hearing would be continued for that purpose.

Following extensive testimony on the city's behalf, the hearing was continued to May 22, 1980, at which time Bastian again claimed that he was not ready to proceed because he had not received the information he had requested from the city, nor had he received a copy of the personnel board's rules or subpoena forms. Bastian then moved to dismiss the charges based on a motion filed the previous day which included 25 affidavits attesting to Bastian's Chicago residency. The hearing officer reiterated that he had no jurisdiction to rule on the motion to dismiss and would forward it to the personnel board. Further, subpoena forms and rules were available for pick up at the personnel board's office at City Hall, and there was no reason Bastian could not have acquired these himself with reasonable diligence. However, because the last city witness was unavailable, the hearing was rescheduled as requested to May 27, 1980. On that date, at the conclusion of the city's case in chief, Bastian's motion for a directed finding was denied and the matter was continued to June 11 for commencement of Bastian's case in chief.

When the hearing resumed on June 11, 20 individuals testified on Bastian's behalf. Nineteen of them were the affiants who had signed the affidavits attached to Bastian's most recent motion to dismiss. The other was Bastian's estranged wife. Testimony indicated that none of the affiants had been under oath, none had had his signature notarized, and the majority of them had made false statements.

In our opinion, the preceding synopsis of the hearing illustrates the exemplary efforts made by the hearing officer to assure that all necessary action was taken to avoid delay, maintain order and insure the development of a clear and complete record. Bastian's claims that he was "rushed" into proceeding without having had adequate time to prepare are simply not supported by the record. Bastian was given ample opportunity to subpoena additional witnesses, he had in excess of one month from the start of the city's case in chief to the start of

---

[4]Pursuant to section 16 of the Administrative Hearings Procedure of the personnel board of the city of Chicago, discovery is to be made upon written request prior to the hearing and filed with the hearing officer and served upon the corporation counsel's office.

his own within which to investigate documents, query witnesses, or otherwise prepare his case. In recognition of the legal axiom that a fair hearing before an administrative agency includes the opportunity to be heard, right to cross-examine adverse witnesses, and right to impartiality in ruling upon the evidence (*Lakeland Construction Co. v. Department of Revenue* (1978), 62 Ill. App. 3d 1036, 1040, 379 N.E.2d 859), we conclude that Bastian was given that opportunity and he cannot now claim he was prejudiced by his failure to take advantage of it.

■ Next, Bastian asserts that he was denied a fair hearing by "the blatant admission of unreliable hearsay from a witness who testified three times that he had no independent recollection." As a general rule, hearsay evidence is not admissible in administrative hearings. (*Goranson v. Department of Registration and Education* (1980), 92 Ill. App. 3d 496, 501, 415 N.E.2d 1249.) However, section 20(a) of the Administrative Hearing Procedures of the personnel board of the city of Chicago allows for the admission of hearsay that is reliable and upon which a reasonable person could form an opinion. Although Bastian again fails to clearly identify the witness to whom he is referring in his allegation, we assume from our review of the record that he is referring to Thomas Pleines, an investigator for the Chicago fire department, who conducted surveillances and canvasses of the Niles neighborhood in order to gather information regarding Bastian's residency. In our opinion, Bastian's hearsay objection to Pleines' testimony regarding comments made by the neighbors during the canvas was properly overruled by the hearing officer. Contrary to Bastian's contention, we find that the hearsay testimony met the criterion of reliability in that notations of the comments had been made at the scene and were later transcribed into a report signed by Pleines. Moreover, we find nothing improper about Pleines' need to refresh his recollection at several different points in his testimony.

Bastian's final due process allegation that the real reasons for his discharge were his high salary grade level and his union involvement is untenable. This allegation has absolutely no support in the record and, in fact, was never even argued at the hearing. In our opinion, it is nothing more than inflammatory speculation and, as such, is an affront to the integrity of this court.

Finally, Bastian's argument for a more clear definition of the word "residence" appears to be a hybrid constitutionality/manifest weight argument, both aspects of which have been previously addressed and require no further discussion. Accordingly, we affirm the personnel board's decision to discharge Bastian.

IV. BYTTOW ONLY

In addition to his contention that the personnel board's decision was against the manifest weight of the evidence, Byttow argues on appeal that the board's findings as articulated in its order of discharge did not constitute adequate grounds for reversal. As support for his position, Byttow relies on *Board of Education v. Ingels* (1979), 75 Ill. App. 3d 334, 394 N.E.2d 69, *Reinhardt v. Board of Education* (1975), 61 Ill. 2d 101, 329 N.E.2d 218, and *Board of Education v. File* (1980), 89 Ill. App. 3d 1132, 412 N.E.2d 1030. After careful review, we find these cases to be inapposite to the present case and, thus, unpersuasive of Byttow's position.

In *Ingels*, following an administrative hearing on charges brought against a tenured certificated teacher for teaching deficiencies, the administrative tribunal determined that there was not clear and convincing evidence of a pattern of deficiency. The board of education sought review of the administrative decision, noting that the tribunal had applied the wrong standard of proof. The proper standard was proof by a preponderance of evidence, not the more stringent clear and convincing standard applied by the tribunal. The circuit court reversed the administrative decision. In upholding the judgment of the circuit court, the appellate court stated that when an incorrect standard of proof is applied as in the case of the administrative tribunal, the resulting finding is invalid and, thus, not capable of review. (*Board of Education v. Ingels* (1979), 75 Ill. App. 3d 334, 337.) As the above indicates, Byttow's reliance on *Ingels* as support for the proposition that the hearing officer's alleged failure to apply any test renders his findings invalid is a gross misapplication of the *Ingels* holding. Moreover, in the present case, there is no evidence as to what test the hearing officer applied and no requirement that there be such evidence. *O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 657, 456 N.E.2d 998.

In *Reinhardt*, plaintiff, a tenured kindergarten teacher, was discharged for immoral behavior. At the conclusion of the hearing, the president of the board polled the board members on the question whether "reasons or causes" existed for the teacher's dismissal. The vote was "yes" and the meeting was adjourned. No findings were made by the board. On appeal to the supreme court, the cause was remanded to the circuit court with instructions to remand to the board for further proceedings on the ground that "a decision by an administrative agency must contain findings to make possible a judicial review of the agency's decision." (*Reinhardt v. Board of Education* (1975), 61 Ill. 2d 101, 103.) In direct contrast to *Reinhardt*, the personnel board in the present case set forth the hearing officer's findings in its "Find-

ings and Decision of the Personnel Board of the City of Chicago," thereby adopting those findings as grounds for its decision.

Finally, we disagree with Byttow's comparison of the findings found inadequate in *File* and those articulated in the present case. Byttow alleges that the findings in *File* were "verbose" compared to those before us now. In *File*, the hearing officer's finding consisted of a statement that plaintiff's dismissal was not for just cause and then proceeded to set forth the disciplinary action to be taken. Relying upon *Reinhardt* and its progeny, the *File* court found that the finding was "a bare decision, nothing more," and, consequently, not reviewable. (*Board of Education v. File* (1980), 89 Ill. App. 3d 1132, 1138.) By contrast, in the present case, the hearing officer made the following findings:

> "1. That the Respondent, Norman C. Byttow was at all times mentioned herein an Engineer with the Chicago Fire Department, with career service status.
>
> 2. That the Respondent received due and adequate notice of the charges against him, and of the time and place of the hearing in the above entitled cause in accordance with the law.
>
> 3. That the Department presented evidence which supports the charges filed against the Respondent Norman C. Byttow."

In our opinion, the above findings constituted much more than "bare decision" in that they satisfied questions of jurisdiction, procedural due process and sufficiency of the evidence. Such findings, coupled with a clear and complete record of the hearing, are fully capable of review. We further note that there is no statutory requirement for detailed and specific findings of fact by an administrative agency. Where the testimony before the agency is preserved for review, specific findings of fact by the agency are unnecessary to obtain judicial review. (*O'Boyle v. Personnel Board* (1983), 119 Ill. App. 3d 648, 657, 456 N.E.2d 998.) Accordingly, we conclude that the order of discharge pertaining to Byttow was valid and reviewable.

For the reasons enumerated above, we affirm the boards' decisions to discharge Fagiano, Bastian, Byttow and Green; affirm the judgment of the trial court as to Fagiano; and reverse the judgments of the trial court as to Bastian, Byttow and Green.

Affirmed in part; reversed in part.

MEJDA, P.J., and SULLIVAN, J., concur.