SIXTH DIVISION

FILED: 05/08/98

No. 1-96-3764

JOHN ZARUBA, )  Appeal from

)  the Circuit Court

Plaintiff-Appellee, )  of Cook County.

)

v. )

)

THE VILLAGE OF OAK PARK, ILLINOIS, an )

Illinois Municipal Corporation, LAWRENCE )

CHRISTMAS, JOHN TROELSTRUP, WILLIAM )

FILLMORE, SUSAN RAKSTANG, BERNARD )

ABRAHAM, FRED POSPISIL, and ALLEN RAPHAEL, )  95 CH 11965

THE HISTORICAL PRESERVATION COMMISSION )

OF THE VILLAGE OF OAK PARK, a Commission )

established by the terms of the Oak Park Historical )

Preservation Ordinance, DAVID SOKOL, )

JEFF FOSTER, UWE FREESE, LESLEY GILMORE, )

GREG JONES, DENNIS LANGLEY, WILLIAM )

MAHALKO, WILLIAM SALTENBERGER, and )

GEORGE VRECHEK, )  Honorable

)  Aaron Jaffe, 

Defendants-Appellants. )  Judge Presiding.

JUSTICE ZWICK delivered the opinion of the court:

The issue in this case is whether the decision of the defendant, Village of Oak Park (the Village), to deny plaintiff, John Zaruba, a Certificate of Economic Hardship was made against the manifest weight of the evidence. The Certificate is required by a Village ordinance before a house located within an historic architectural district may be demolished. On administrative review, the circuit court reversed the Village. After reviewing the record, we find the Village's decision to deny the Certificate to have been supported by the evidence. We therefore affirm the Village's decision and reverse the circuit court.

The Village's Historic Preservation Ordinance (the Ordinance) became effective on January 1, 1994. The Ordinance prevents the demolition of landmark buildings or contributing architectural resources located within the Village's Frank Lloyd Wright Prairie School of Architecture Historic District (the District). Exceptions are made upon the granting of a Certificate of Appropriateness or Certificate of Economic Hardship.

Plaintiff  purchased the property located at 616 N. Kenilworth Avenue, a lot within the District, on March 14, 1995. The property consisted of a 45-foot wide parcel containing an 86-year old single-family house. Plaintiff purchased the property for $227,500.

On June 23, 1995, plaintiff applied for a wrecking permit to demolish the building. At that time he was informed by Village staff that a wrecking permit could not be issued without the Village first issuing either a Certificate of Appropriateness or a Certificate of Economic Hardship. 

Plaintiff subsequently applied for a Certificate of Appropriateness on grounds that the building was not a contributing resource to the District. The Historic Preservation Commission (the Commission) held a hearing and concluded that the building was a contributing resource. It therefore denied the plaintiff's request on July 13, 1995. Plaintiff was informed in writing of his right to challenge the decision at public hearing before the Village Board of Trustees, but elected not to pursue this remedy.

On August 1, 1995, plaintiff applied for a Certificate of Economic Hardship. 

At the hearing before the Commission on September 14, 1995, plaintiff testified that he had lived for the preceding five years at 614 N. Kenilworth. For approximately 40 years prior to plaintiff's purchase of 616 N. Kenilworth, and for a short period thereafter, a man named John Glavin lived in the house at 616 N. Kenilworth. Glavin was in his early 90s at the time of the sale of his house to plaintiff.

Plaintiff testified that he had, over the years, "polite conversations" with Mr. Glavin about whether he would be willing to sell the property. In the fall prior to the hearing, the conversations became serious. Plaintiff offered Glavin $150,000 based upon a professional appraisal plaintiff commissioned showing the property was worth $165,000. Glavin was "somewhat insulted" by the offer and told plaintiff that he had already turned down a $200,000 bid for the property from a woman named Colleen Myra. Plaintiff spoke with Myra and verified her written offer to Glavin. Plaintiff eventually offered Glavin $227,500 for the property, which Glavin accepted.

Plaintiff testified that he was motivated to purchase the property because he wanted to protect his investment in his own home. He stated:

"I wanted to have some sort of control over what happened next door to me and I had the financial means to do so, so I made him an offer of $227,500 motivated by the desire to annex [his] property to mine to prevent somebody from, frankly, from adding a big addition on to the back of 616 and adding a big garage to the back and whatever that might have transpired which would have in a sense blocked my -- blocked my view, filled up the backyard."

Plaintiff stated that he believed combining the two properties would increase the value of his home, but he could not offer an estimate of by how much the properties would be worth if joined together. He presented a detailed architectural drawing showing a proposed extension of his front porch over the existing driveway at 614 N. Kenilworth, as well as a proposed new side-facing garage which he planned to erect on the site where Glavin's house stood. The proposed garage was designed to carefully unify the two lots. 

It was established at the hearing that the Glavin house had substantially deteriorated over the course of the 40 years John Glavin had lived there. There were holes in the roof where a family of raccoons had taken up residence. The furnace was seriously damaged and several radiators had been disconnected. Water was leaking into the basement through a missing door and there was exposed wiring both inside and outside the house. Mortar in the chimney had eroded and the chimney was being held together by the supports of a television antennae. Siding on the southeast corner of the house was leaking. The house's foundation required tuckpointing in three or four locations. In addition, the garage was structurally unsound and in need of demolition. Plaintiff testified that when he purchased the house it was uninsurable due to the condition of the electrical and heating systems. Glavin did not have home owner's insurance on the property at the time of the sale to plaintiff.

After purchasing the property, plaintiff destroyed the garage and removed significant amounts of debris from the exterior of the home. He also had asbestos removed from the pipes around the furnace. 

Plaintiff offered three separate and detailed estimates about what it would cost to renovate the property. He testified that any renovations would have to include tree removal, re-roofing, rebuilding of the chimney, extensive electrical work done to bring the wiring up to Village Code, interior and exterior painting, refurbishing of the leaded windows, sanding and cleaning of the wooden floors, installation of a new furnace and water heater, re-plumbing one of the bathrooms, replacement of several radiators, construction of a new garage, construction of new front stairs and railing, and basic kitchen renovations. One "top notch" estimate of the cost of renovation, not including non-essential work with the exception of the installation of central air conditioning, was $253,000. This estimate was made by Oak Park Design, a local rehabber. Plaintiff admitted that this estimate was high and stated that he was not relying upon it to make out his case of economic hardship. 

Plaintiff reviewed the three estimates together and determined that a total "conservative estimate" of what it would cost to renovate the home would be $102,500. To this amount plaintiff added a general contractor's fee of 20% and the cost of work he had already done to the property. This brought his expected renovation sub-total to $126,997. When plaintiff added fees, taxes and the cost of borrowing, his "total estimate" for renovating the home was $141,500.

Plaintiff added his costs of purchasing the property from Glavin with his expected costs of refurbishing it, and concluded that he would have to sell the property without a real estate agent for a price of at least $369,000 ($227,500 plus $141,500) just to break even on his purchase. If an agent were used, a fee of approximately five percent would have to be added, bringing the total break-even sale price to $388,372.

To establish economic hardship under the Ordinance, plaintiff offered testimony as to what the real estate market would support in the area surrounding the Glavin house. He provided "real estate comps" showing houses of a similar size and style selling at prices between $200,000 and $330,000. He noted that these figures were for houses that each had features the renovated Glavin house would not have. For example, many of the houses had eat-in kitchens, central air conditioning or a den. One house, just five houses away from the Glavin house, was characterized as a particularly good comparison. It included a breakfast room, a fifth bedroom, foyer, completely new master bath, a finished third floor, basement and rec room -- all features the Glavin house did not have -- and was listed at a selling price of $330,000. Plaintiff testified that, based on the estimated costs of renovation and the real estate market in the area, it would simply not be possible to sell the Glavin house for anything approaching $388,000.

When asked about the market value of the Glavin property as a vacant lot, plaintiff testified that he had no opinion, except to say that he was willing to pay  $227,500 for it. When asked about whether he knew of the existence of the Ordinance when he purchased the property, plaintiff testified that he knew there was an ordinance, but that he was unaware of its specifics.

Several neighbors testified in favor of plaintiff's application. Jean Brooks, Michael Gray, Robert Cimarusti, and Koster Van Gross all testified that the property had been steadily deteriorating over many years. Royce Cramton added that several of the homes in the neighborhood had double lots such as the one proposed by plaintiff. In addition to agreeing with the other neighbors, Barry Eisenberg testified that he was a professional economist and had reviewed the numbers that plaintiff had presented to the Commission. According to Eisenberg, "any reasonable assessment and compiling of the numbers [demonstrates] an economic hardship."

In opposition to the plaintiff's application, the Village presented the testimony of its Chief Building Inspector, Robert Borman. Borman testified that he had inspected the Glavin property and had given consideration to six specific areas. These were the overall condition of the building, the foundation, the heating plant, the electrical system, the plumbing system and the roof. 

Borman found the exterior of the Glavin home to be in need of scraping, cleaning or painting and some stucco needed to be replaced. The front porch was structurally sound, although some windows and doors also needed replacement. In the front yard Borman found an abandoned oil tank of unknown size. The stone foundation was in good condition. 

Borman stated the heating system was inoperable and in need of replacement. Only the radiators and some piping were salvageable. The electrical system needed to be totally reworked throughout the building and the plumbing system was outdated and in need of replacement. Borman also stated that the roofing material on the house was severely worn and there were visible holes in the roof. A "complete tear off of the roofing material and replacement of the sheathing" was required.

Borman concluded that, "[A]lthough the house is in need of a lot of rehabilitation, my findings show that the house is structurally sound."  In Borman's experience, "the building should not be considered a candidate for demolition." 

Ms. Lois Merrill testified that she was an experienced licensed real estate agent doing business in Oak Park since 1974. Although Merrill was not an appraiser, she testified that part of her job was to help sellers determine what an appropriate price would be for the sale of a given home. In that context, she had prepared a market value report which showed that one property near the Glavin home had been purchased for $137,500 in 1991 and then rehabbed and sold in 1993 for $268,000. Another property had been purchased for $176,500 in 1994 and then resold for $335,000 after rehabilitation. Merrill reviewed several local properties and noted that they had been selling for between $245,000 and $330,000. 

Merrill testified that she had inspected the house and determined that, if it were to be sold "as is," it would sell between $160,000 and $180,000. She stated that if the property were rehabbed, it "might sell for a range between $280,000 and $300,000." She stated that there was evidence that the block could sustain a price over $300,000, but that would require the addition of more square footage to the structure of the house. She said that the house would not be a problem to sell and that, if Mr. Glavin had hired her, she might even have been able to sell it in the high 190s "that day." She testified, "It's that kind of marketplace where people would be very happy to get a hold of this kind of property." Although Merrill said she had heard the other witnesses, her view of the building was consistent with Borman's -- i.e., that the house was structurally sound. She expressed surprise at the lack of damage to the inside of the home in light of the fact that the interior of the house had been partially exposed to the elements. In her written materials which Merrill presented to the Commission, Merrill described the property as "wonderful rehab opportunity. Location high demand."

A third witness for the Village was Mr. Mark Alger. He testified that he was the Construction Technologist for the Village's Single Family Homeowner Program. Mr. Alger had extensive experience in the construction and rehabilitation industry. Alger described the mission of the Single Family Home Program as bringing houses that are in the program up to Village Code and to what HUD refers to as "Housing Quality Standards." Alger used this same criteria in evaluating the Glavin home. He explained that, because of HUD's lower standards, there were disparities between what he would estimate a rehabilitation would cost and the costs plaintiff had estimated. For example, Alger said that he would not sand the hard-wood flooring in the house, although a home owner might prefer to have sanded flooring and such an improvement might make the home more marketable. He described the rehabilitation he considered necessary as that required to create a "medium quality home." 

In Alger's view, the cost of rehabilitating the property would be $61,350, a figure which included both a 15% contingency and general contractor's fees. He admitted that one could "easily add another $25,000" to the renovations to make the home more marketable, but that these costs were not necessary to meet HUD's Home Quality Standards. 

Following the testimony plaintiff made his closing argument and the Commissioners discussed the merits of both granting and denying plaintiff's application. The Commission then voted to deny the application. Subsequently, in a written decision, the Commission found that the plaintiff had failed to establish that the house was incapable of being put to any reasonable use or that he could not obtain a reasonable economic return from the property without first demolishing the building. The Commission also found that the building was structurally sound, although in need of extensive rehabilitation costing between $60,000 and $253,000. The Commission noted that there had been no substantial change in economic circumstances of the property since plaintiff purchased it and, therefore, any difficulty plaintiff encountered in obtaining a reasonable economic return on his purchase would be unaffected by the demolition of the building. The Commission concluded that any economic hardship placed upon the plaintiff had been brought about, at least in part, by his own actions.

The Village notified the plaintiff of the Commission's decision by letter dated September 26, 1995. The plaintiff timely appealed the decision to the Village Board of Trustees. Following a hearing on November 6, 1995, the Village Board adopted the Commission's findings.

On December 14, 1995, the plaintiff sought administrative review in the circuit court. On October 1, 1996, the circuit court reversed the Village and entered judgment in favor of the plaintiff. The court specifically noting that the building had been allowed to deteriorate for more than 30 years and determined that the rehabilitation of the building would cause plaintiff an economic hardship. The court also determined that the Commission should not have considered whether the plaintiff's economic hardship was self-imposed, at least absent a finding of an intent by him to circumvent the Ordinance. The Village brought this timely appeal.

As we have noted, the Ordinance precludes the issuance of a demolition permit until the issuance of a Certificate of Appropriateness or Certificate of Economic Hardship. Village of Oak Park Municipal Code, § 7--9--9 (eff. January 1, 1994). A Certificate of Economic Hardship is defined by the Ordinance as:

"A certificate issued by the Commission, after denying a certificate of appropriateness, which authorizes the performance of alterations, construction or relocation with regard to historic landmarks, or the removal or demolition of an historic landmark or a building, structure or improvement within an historic district when such historic landmarks, or properties within an historic district cannot be put to a reasonable beneficial use or the owner cannot obtain a reasonable economic return thereon without the proposed alteration, construction, relocation, removal or demolition." 

We begin our analysis of the Ordinance by noting that it is the function of the appellate court to determine only whether the Commission's findings and decision which were adopted by the Board are against the manifest weight of the evidence. 
Mitchell v. Sackett
, 27 Ill.App.2d 335, 343, 169 N.E.2d 833 (1960). "We give no deference to the determination of the circuit court when it sits in administrative review." 
Pontiac Lodge No. 294, A.F. & A.M. v. Department of Revenue
, 243 Ill. App. 3d 186, 192, 611 N.E.2d 62 (1993). Moreover, in reviewing the record, we are mindful that a Certificate of Economic Hardship is an exception to the general prohibition against demolishing contributing architectural resources located within the District. Thus, the burden at the hearing was squarely upon the plaintiff, the party seeking the certificate. See 
Pontiac Lodge
, 243 Ill. App. 3d at 192-93, citing 
Methodist Old Peoples Home v. Korzen
, 39 Ill. 2d 149, 155, 233 N.E.2d 537 (1968). In determining whether property is included within the scope of an exemption, all facts are to be construed and all debatable questions resolved against granting the exemption. See 
City of Chicago v. Illinois Department of Revenue
, 147 Ill. 2d 484, 491-92, 590 N.E.2d 478 (1992).

A decision is said to be contrary to the manifest weight of the evidence only when, after reviewing the evidence in a light most favorable to the administrative agency, the court determines that no rational trier of fact could have agreed with the agency's decision. 
Service Employees International Local Union No. 316 v. Illinois Educational
 Labor Relations Board
, 153 Ill.App.3d 744, 753, 505 N.E.2d 418 (1987). In other words, reversal is appropriate only when the opposite conclusion of the one reached by the Commission is "clearly evident." 
Madonia v. Houston
, 125 Ill.App.3d 713, 716, 466 N.E.2d 648 (1984). If the record contains any
 evidence supporting the Commission's decision to deny the certificate, the decision must be sustained on review. 
Fagiano v. Police Board
, 123 Ill.App.3d 963, 974, 463 N.E.2d 845 (1984).

Plaintiff argues that, under the terms of the Ordinance and with regard to the Glavin property, he "cannot obtain a reasonable economic return thereon without the proposed *** demolition." In our view, however, the evidence presented to the Commission was merely conflicting and therefore sufficient to support the Commission's ultimate determination.

The Ordinance lists five factors to be considered by the Commission in determining whether a certificate should be issued. In the context of the facts presented, where the Commission did not make any specific recommendations to the plaintiff for changes which would allow the granting of a Certificate of Appropriateness, only the following four factors are relevant:
(footnote: 1) (1) a substantial decrease in the fair market value of the property as a result of the denial of the certificate of appropriateness; (2) the structural soundness of any structures on the property and their suitability for rehabilitation; (3) the economic feasibility of rehabilitation or reuse of the existing structure or improvement on the property in the case of proposed demolition; and (4) the cost of the proposed construction, alteration, relocation or demolition. See Village of Oak Park Municipal Ordinance, § 7--9--14 (eff. January 1, 1994).

Plaintiff failed to produce any evidence with regard to whether the denial of the Certificate of Appropriateness resulted in a substantial decrease in the property's fair market value. He stated repeatedly that he was not relying upon his purchase price to establish a fair market value for the Glavin property. Accordingly, this factor does not support his application.

With regard to the structural soundness of the Glavin house, all of the evidence supports the Village's decision. Robert Borman, the Village Chief Building Inspector, found that the building was deteriorating in many areas but he concluded that the building was structurally sound. The plaintiff's own evidence showed the building could be rehabilitated to Code requirements without work on the supporting structure of the house.

With regard to the feasibility of rehabilitation or use of the existing structure, we make several observations. First, plaintiff bases his entire case on a claim that the house was unmarketable at a reasonable price as a rehabilitation opportunity, yet we cannot help but note that plaintiff was unwilling to list the property so as to put his assertion of unmarketability to the test. The inference created by plaintiff's failure to list the property for sale is clearly one that must be held against his claim of unmarketability. Indeed, he admitted at the hearing that he purchased the property at what the market might consider an inflated price for rehabilitation precisely because he feared that the house would be purchased and that the new owner would expand it into the backyard. As the Village argues, if plaintiff can receive market value for the building in the same real estate market as when he purchased it, there can be no economic hardship as a result of the denial of his request to demolish the building. 

Our second observation is that plaintiff only offered evidence as to what it would cost to renovate the house without adding square footage. Plaintiff's evidence leaves unresolved the question of whether the Village would have allowed a Certificate of Appropriateness for an addition to the house, as opposed to a complete tear-down. In such a situation, where an extension to the back of the Glavin house was proposed, it is quite possible that the plaintiff could recoup his investment.

Third, the evidence is far from clear that the house is incapable of being rehabbed and sold at a profit, at least if plaintiff had not deliberately overbid. In his brief plaintiff concedes that the property's fair market value was approximately $190,000 at the time he bought it for $227,500, but he insists that no one would willingly purchase the home as an investment at the $190,000 price. Although we agree that the evidence could have been interpreted by the Commission in this way, such an interpretation is not the only reasonable one. Mark Alger testified that the property could have been repaired and converted to a medium quality home for approximately $61,000, a price which included general contractor fees and a 15% contingency. The fact that Colleen Myra offered to purchase the house in its dilapidated state for $200,000 is particularly damaging to plaintiff's argument. Assuming a purchase price of $200,000, Myra could have lived in the home for under $265,000. Even if the property were resold, it is possible at these prices that Myra could have made a profit on the sale, even if a realtor's commission were added to her cost. This is because real estate agent Lois Merrill testified that the house could potentially sustain a price of from $280,000 to $300,000 if renovated.

Finally, with regard to the costs associated with the plaintiff's proposed renovation to the property, we note that he has failed to suggest the economic costs of leveling the Glavin house and building the new garage. These costs are important to consider because whether a Certificate of Economic Hardship should be granted under the Ordinance depends, in part, on whether demolishing the Glavin house will have the effect of lessening the economic burden of owning the property, a burden which may exist independently of whether demolition is allowed or denied. To this extent, the question is not so narrow as whether plaintiff can recover his out-of-pocket costs or make a profit by rehabilitating the Glavin property. Rather, the proper comparison must take into account all of the economic effects of plaintiff's proposal, including the net economic effect the proposed use of the Glavin lot will have on the value of plaintiff's existing home. 

The question boils down to whether the demolition and proposed use of the combined properties will have a net economic benefit to plaintiff 
vis
 
a
 
vis
 renovating the Glavin property for resale. When all the costs are properly considered, it becomes clear that renovating the Glavin house for resale might be the best economic course for plaintiff 
even
 
if
 a demolition permit were granted by the Commission, and 
even
 
if
 renovating the property would mean plaintiff would suffer an out-of-pocket loss on his purchase of the Glavin property.

Assume, for example, that the Zaruba house has a fair market value of $350,000, and that the Glavin house has a fair market value of $200,000. Assume further that, after buying the Glavin property for $200,000 and spending $50,000 to tear it down and erect a new garage such as the one designed by plaintiff's architect, the fair market value of the combined properties would be $500,000. Under this scenario, plaintiff would be proposing to spend $250,000 to obtain a potential economic benefit of only $150,000, thus causing him to suffer a $100,000 loss in value on the transaction. If the evidence establishes that renovating the Glavin house and selling the property to a third party would cause a loss in value to plaintiff of $80,000, or even one of $90,000, renovating the Glavin house would still make economic sense over demolishing it and erecting a garage. This is because renovating and selling the Glavin property would produce a lesser economic loss than annexing the Glavin lot, tearing down the Glavin house and building a garage. Moreover, the resale of the renovated Glavin property would have the benefit to the Village of preserving one of the District's contributing architectural resources, the central purpose of the Village's Ordinance. In our view, the fact that plaintiff is willing to bear the more severe economic consequences of one course of action but not of the other is simply not relevant to an "economic" consideration of the hardship question.

In sum, we find evidence presented to the Commission to have been sufficient to sustain the decision of the Village Board. This being the case, the Commission's refusal to grant plaintiff a Certificate of Economic Hardship is affirmed.

Circuit Court Reversed. Board of Trustees of the Village of Oak Park Affirmed.

CAMPBELL, P.J. and QUINN, J., concur.

FOOTNOTES
1:
The Ordinance also states that the Commission may consider "a substantial decrease in the pre-tax or after-tax return to owners of record or other investors in the property as a result of the denial of the certificate of appropriateness."