VALLEY MOULD & IRON COMPANY, Plaintiff-Appellant, v. THE ILLINOIS HUMAN RIGHTS COMMISSION *et al.*, Defendants-Appellees.

First District (5th Division)   No. 83—1536

Opinion filed April 19, 1985.

Bradford L. Livingston, of Seyfarth, Shaw, Fairweather & Geraldson, and Allan Gunn, both of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Thomas P. Marnell, Assistant Attorney General, of Chicago, of counsel), for appellee Human Rights Commission.

Melvin Gaines, of Chicago, for appellee Columbus Pitts.

JUSTICE LORENZ delivered the opinion of the court:
This is an appeal from an order of the trial court affirming a deci-

sion of the Human Rights Commission (Commission) that plaintiff violated section 3(a) of the Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 853(a))[1] in that it discriminated against defendant Columbus Pitts (Pitts) on the basis of his race (black), with respect to his discharge from plaintiff's employment. On appeal, plaintiff contends (1) that the Commission erred in concluding as a matter of law that plaintiff did not articulate a legitimate reason for Pitts' termination from employment; and (2) that plaintiff is entitled to judgment in its favor because it articulated a legitimate unrebutted reason for Pitts' discharge.

On December 10, 1978, Pitts began his employment with plaintiff as a chipper in its stool department. Pursuant to a collective bargaining agreement, Pitts bid on the job of coremaker, and was awarded this position on December 21, 1978. As a coremaker, Pitts was responsible for the operation of a machine known a the no-bake blender (blender) for one eight-hour shift per day. This blender mixes sand with resin and acid to produce a substance which is discharged into coreboxes to form concrete-like sandcores. These cores are used to make indentations or lifting devices on the large cast-iron ingot moulds manufactured by plaintiff.

Pitts was terminated on January 16, 1979, for allegedly breaking the blender. At the time of his discharge, Pitts was a probationary employee. In his charge before the Illinois Fair Employment Practices Commission (FEPC), Pitts alleged that he was discharged because of his race and not because of his work performance. The FEPC issued a complaint against plaintiff, and at a hearing thereon before an administrative law judge (ALJ), the following testimony was heard.

Anthony Sanetta, plaintiff's plant superintendent, was called by Pitts as an adverse witness. He testified that plaintiff operates three eight-hour shifts daily. Every morning, Sanetta receives reports from all general foremen. During the period between December 10, 1978, and January 15, 1979, Sanetta spoke with Pitts regarding his alleged damaging of wooden coreboxes. Sanetta was told by Tim Storey, plaintiff's equipment manager, that Pitts was damaging the coreboxes by using a sledgehammer to open them.

---

[1]On July 1, 1980, the Fair Employment Practices Act was superseded by the Illinois Human Rights Act. (Ill. Rev. Stat. 1981, ch. 68, par. 1—101 *et seq.*) The Illinois Human Rights Act provides that complaints issued under the Fair Employment Practices Act, as the complaint in the instant case, shall be assumed by the Human Rights Commission. (Ill. Rev. Stat. 1981, ch. 68, par. 9—102.) Section 3 of the Fair Employment Practices Act is substantially the same as section 2—102(A) of the Illinois Human Rights Act (Ill. Rev. Stat. 1981, ch. 68, par. 2—102(A)).

Edward Kutnick, plaintiff's personnel manager, was also called as an adverse witness. On January 15, 1979, he received an order from Superintendent Sanetta to terminate Pitts for burning out the blender's motor. This was the only reason given to him. At the administrative hearing, he produced the personnel records of four men—Gonzalez, Ratliff, Escobedo and Garcia. He testified that all four of these men worked on the blender during the period between its initial installation in 1977 and December 18, 1978. None of these men were ever fired for burning out the blender's motor. He believed that others had been terminated for burning out the motor, but he could not recall any names. Kutnick stated that he assumed that any and all performance reprimands were given to Pitts in writing per union provisions. Kutnick admitted that plaintiff did no aptitude testing outside of its maintenance department, and that all other jobs are based upon bid agreements. The method used to replace a terminated employee is also based on these agreements. Those who work in the department where the job is open are given the first opportunity to bid on the job. If no one in that department bids on the job, then it opens for plant-wide bidding. Notice of the job opening is posted on a bulletin board. Following Pitts' termination, only Mr. Rudin, a white, bid on the opening caused by Pitts' discharge.

Nicholas Coppage testified as an adverse witness. He was hired as a foreman for plaintiff on December 10, 1978, at the age of 19, and received three weeks of on-the-job training. Coppage testified that the blender trough was frozen when he reported for the midnight shift on January 15, 1979. He stated that the blender "freezes" when the chemical reaction between the resin, acid and sand occurs too fast. If the blender's trough is not evacuated in time, the materials remaining within the trough harden. Once this occurs, a coremaker must climb up to the trough and try to loosen the material. He further testified that the blender was frozen on a shift prior to his, and he did not know who caused this condition. He admitted that when Pitts began work with him on the midnight shift, the trough was already frozen; that Pitts spent his entire shift trying to unfreeze the trough; and that it was still frozen at the end of Pitts' shift at 8 a.m. on January 15, 1979. He did not recall telling Pitts to start the blender, and he never saw Pitts try to activate the motor. Further, he never told anyone that Pitts burned out the motor; to his knowledge, no motor burned out on his shift.

Coppage identified several maintenance reports which indicated that the blender was inoperative on January 2, 1979, because of frozen lines; that the motor on the blender burned out on January 7 and

8, 1979; and that the fuse for the blender's motor was removed on January 14, 1979, during the shift which preceded Pitts' and Coppage's shift. There was no notation of the fuse's replacement during the midnight shift. Coppage admitted that the blender could not operate without its fuses.

C. Timothy Storey, plaintiff's equipment supervisor, testified as an adverse witness that he considers himself an expert on the blender's operation. Although he admitted that there are no written instructions on the operation of the blender, he testified that each time a new operator begins the job, he receives training on the machine. Storey testified that when he arrived at work on January 15, 1979, at 8 a.m., Pitts came to his office to inform him that the blender was already frozen when he arrived for his shift, and that he had spent the entire shift trying to chip out the machine. Pitts also told him that he told his foreman about the condition of the machine. Storey testified that he conducted an investigation as to the blender's breakdown on January 15, 1979; the investigation was precipitated by a total lack of production by the blender for two shifts on January 14. He inspected the blender on January 15 and found it inoperable; he noticed mechanics working on it, but did not know what condition the motor was in. He next spoke to Mr. Ratliff, the blender's operator for the shift before Pitts'. He testified that Ratliff informed him that the blender froze during his shift, and that he had unsuccessfully attempted to unfreeze it. Storey also testified that he spoke to foreman Coppage within the next few days. After his conversation with Coppage, he recommended to Superintendent Sanetta that Pitts be terminated. The report of termination stated "First turn [shift] 1-15-79 drive motor burnup." Storey admitted that he did not see Pitts operating the blender at any time on January 15, 1979, and that he did not see who operated the motor when it burned up. When questioned as to the basis for his statement on Pitts' termination letter ("First turn [shift] 1-15-79 drive motor burnup") which he signed, Storey denied that the statement was based on a conversation that he had with Coppage, and denied that it was based on any observation of Pitts that he himself made on either January 14 and 15.

In reference to other burnouts which allegedly occurred on the blender, Storey testified that the motor had burned out on January 7, 8 and 11. He could not attribute the January 7 burnout to anyone, but he blamed Garcia for the January 8 burnout, and had written Pitts' name on his diary with reference to the January 11 incident. Garcia was not fired for the burnout. He stated that his diary showed an entry of "blender down 8 hours 4 p.m.-12 a.m. on Jan. 14th," and listed

the shifts and names of the operators—Gonzalez, Ratliff and Pitts. Storey testified that the blender's motor had never burned out prior to January 7. Further, he admitted that the motor had burned out on January 17, after Pitts had been terminated, but that he did not know who was responsible. Regarding his prior statement to FEPC that he determined Pitts was responsible for the motor's burning out as a result of his conversation with Coppage, Storey could not recall if Coppage said Pitts was operating the motor when it burned out. He admitted that Pitts *never* confessed to him that he burned out the motor, but stated that his conversation with Coppage was important in his recommendation that Pitts be discharged.

Ratliff, a blender operator since December 1978, testified that the blender also broke down on December 10 and 15, 1978. Ratliff testified that on January 14, 1979, Augustine Gonzalez was working the blender on the 8 a.m.-4 p.m. shift. This shift was immediately before Ratliff's 4 p.m.-12 midnight shift; when Ratliff reported to work that day, the blender was already inoperable. He stated that he told his foreman that the machine was broken; when Pitts relieved him at midnight he informed Pitts that the machine was broken before he got to work, and who had broken it. He placed the blame for the blender's breakdown on Gonzalez.

Ratliff, who is black, was previously disciplined in connection with his operation of the blender. He received a written warning and later a suspension for "disregard of orders." Ratliff had no knowledge of any other nonblack blender operators who were ever severely disciplined. On cross-examination, he stated that to his knowledge, the only reason that the blender wasn't operating on January 14, 1979, was that it was frozen. However, he made no inspection of the blender's motor or its electrical system.

Columbus Pitts testified that he was never late for work as a coremaker; that he never missed any days of work during this time; and that he was never warned about his work until the time he was discharged. He stated that plaintiff's management told him that he was discharged because he broke the blender. Pitts testified that a week before his discharge, plaintiff sent two whites into the department for blender training; Pitts was told to show them how to operate the blender. One of these trainees was the man who replaced Pitts upon his discharge.

In plaintiff's case, Storey testified that the decision to terminate Pitts was based on a "series of events," including Pitts' destruction of the coreboxes. He stated that there are four fuses for the blender's motor. Further, he testified that Pitts knew that he had not burned

out the blender's motor, because he had told Storey that he "tried it." Pitts was the first person ever to be terminated in connection with an incident with the blender. Two other men were terminated after Pitts, but neither for motor burnout. A copy of a written warning pertaining to Pitts' destruction of the coreboxes was admitted to show that he had received a written warning. Storey acknowledged that both Gonzalez and Garcia worked for plaintiff for 20 years.

In rebuttal, Pitts testified that he did not recall ever being given the written warning concerning the corebox destruction.

The administrative law judge concluded that plaintiff had established a *prima facie* case of racial discrimination by showing that black employees, including himself, were inequitably investigated and disciplined for breakdowns of the blender; that plaintiff had failed to articulate a legitimate nondiscriminatory reason for such disparate treatment or for Pitts' discharge; that Pitts had shown plaintiff's claim of unsatisfactory work performance to be pretextual; and that plaintiff had violated section 3(a) of the Fair Employment Practices Act (Ill. Rev. Stat. 1979, ch. 48, par. 853(a)) by discriminatorily discharging complainant on the basis of his race.

Her findings and conclusions were adopted by the Human Rights Commission (successor to FEPC), and the trial court found that its decision was not against the manifest weight of the evidence. This appeal followed.

OPINION

■ The Illinois Human Rights Act (Ill. Rev. Stat. 1981, ch. 68, par. 1—101 *et seq.*) is similar to title VII of the Civil Rights Act of 1964 (42 U.S.C. sec. 2000a *et seq.* (1976)), and Illinois courts have routinely consulted and relied upon Federal experience when determining whether discrimination violates Illinois law. (See *Freeman United Coal Mining Co. v. Fair Employment Practices Com.* (1983), 113 Ill. App. 3d 19, 22, 446 N.E.2d 543; *Board of Education v. Illinois Fair Employment Practices Com.* (1979), 79 Ill. App. 3d 446, 452, 398 N.E.2d 619.) Both statutes prohibit employment discrimination on the basis of race, color, religion, sex or national origin. Under title VII, a claim of employment discrimination can be brought under either the "disparate treatment" theory (*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817) or under the "disparate impact" theory (*Griggs v. Duke Power Co.* (1971), 401 U.S. 424, 28 L. Ed. 2d 158, 91 S. Ct. 849). In the case before us, the Commission found discrimination to have been proved under the disparate treatment theory.

■ As the Supreme Court explained in *International Brotherhood of Teamsters v. United States* (1977), 431 U.S. 324, 52 L. Ed. 2d 396, 97 S. Ct. 1843, disparate treatment means "the employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." (431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 415 n.15, 97 S. Ct. 1843, 1854 n.15.) In order to prevail, the employee bears the burden of persuasion throughout the hearing that he has been the victim of intentional discrimination (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 67 L. Ed. 2d 207, 215, 101 S. Ct. 1089, 1093-94.) To meet this ultimate burden of persuasion, the employee "may succeed *** either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation [for discharge] is unworthy of credence." (450 U.S. 248, 256, 67 L. Ed. 2d 207, 217, 101 S. Ct. 1089, 1095.) Since this motive or intent is seldom capable of proof by direct evidence, the Supreme Court has established a legal framework which allows a court to infer discriminatory motive on the basis of circumstantial evidence. 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 214-15, 101 S. Ct. 1089, 1093.

The Supreme Court has grappled with the issue of burdens of proof in disparate treatment actions in a series of cases commencing with *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817, and, most recently, culminating in *United States Postal Service Board v. Aikens* (1983), 460 U.S. 711, 75 L. Ed. 2d 403, 103 S. Ct. 1478, the Supreme Court developed a procedure frequently used to prove discrimination in disparate treatment actions.

■ The three-step burden of proof analysis created by the court in *McDonnell Douglas Corp.* and later refined in *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089, requires first, that the employee establish a *prima facie* case of illegal discrimination. The elements of a *prima facie* case as set forth in *McDonnell Douglas* have been adapted and broadly applied to a variety of employment decisions, including termination, where:

> "[the employee] proves by a preponderance of the evidence that he or she is a member of a protected class, was qualified for the position held, and was discharged and replaced by a person outside of the protected class or was discharged while a person outside of the class with equal or lesser qualifications was retained, then [the employee] has established a 'prima facie case'

of discrimination." *Lee v. Russell County Board of Education* (11th Cir. 1982), 684 F.2d 769, 773; see also *Clark Oil & Refining Corp. v. Golden* (1983), 114 Ill. App. 3d 300, 448 N.E.2d 958.

■ The employee's establishment of a *prima facie* case creates a rebuttable presumption that the employer unlawfully discriminated against the employee. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.) Once the employee carries the initial burden and shows a *prima facie* case, step two shifts the burden to the employer to "articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory action. (*Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 578, 57 L. Ed. 2d 957, 968, 98 S. Ct. 2943, 2950.) If the employer fails to meet this burden, the employee's *prima facie* case stands unrebutted and judgment must be entered for the employee as a matter of law. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 254, 67 L. Ed. 207, 215-16, 101 S. Ct. 1089, 1094.) If the employer articulates a legitimate nondiscriminatory reason, the presumption created by the *prima facie* showing drops from the case and the factual inquiry proceeds to a new level of specificity. (*United States Postal Service Board v. Aikens* (1983), 460 U.S. 711, 715, 75 L. Ed. 2d 403, 410, 103 S. Ct. 1478, 1482.) The employee must have an adequate "opportunity to demonstrate that the proffered reason was not the true reason for the employment decision [to discharge]," but rather a pretext. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 256, 67 L. Ed. 2d 207, 217, 101 S. Ct. 1089, 1095.

In the instant case, plaintiff concedes that Pitts has established his *prima facie* case for discriminatory discharge. Plaintiff contends that the issue in dispute is whether it articulated a legitimate reason for terminating Pitts where the supervisors who terminated him did not have first-hand knowledge of all the events which caused his termination. It posits that both the Commission and the circuit court adopted and affirmed the ALJ's recommended order solely upon their determination that the ALJ's findings of fact were not contrary to the manifest weight of the evidence, without any regard to the legal reasoning behind the order. As a result, plaintiff contends, there can be no finding of discrimination as a matter of law upon our review, because the ALJ erred when she determined that plaintiff had not "articulated" a legitimate nondiscriminatory reason for its discharge of Pitts.

We note at this juncture that the ALJ's order stated in part:

"Respondent was hindered in the presentation of its defense by the fact that the witnesses it selected lacked first-hand knowledge of the events upon which the decision to terminate complainant was based. In the absence of additional witnesses or business records respondent's two witnesses could articulate this factual predicate only as what they thought they had heard before they terminated complainant and not as the truth of the matters asserted to them.

\* \* \*

It is therefore of paramount importance to the effective administration of employment discrimination laws that the complainant's right to confront and cross-examine the witnesses against him be preserved to the fullest possible extent by strict construction of evidence rules prohibiting hearsay in every case. I therefore hold that an employer's 'legitimate non-discriminatory reason' for terminating a protected worker cannot be considered 'articulated' within the meaning of the FEPA and *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24 (1978), unless and until it is presented at hearing by a person evidencing first-hand knowledge."

Plaintiff argues that the ALJ's holding placed too stringent a burden upon it—one that made it necessary to *prove* that Pitts had burned out the blender's motor—before a finding could be made that it had "articulated" a legitimate nondiscriminatory reason for Pitts' discharge. We disagree with this analysis of the ALJ's holding.

At the time of the ALJ's order of February 1981, the Supreme Court's most recent opinions as to what constituted an "articulated legitimate nondiscriminatory" reason were *Furnco Construction Corp. v. Waters* (1978), 438 U.S. 567, 57 L. Ed. 2d 957, 98 S. Ct. 2943, and *Board of Trustees v. Sweeney* (1978), 439 U.S. 24, 58 L. Ed. 2d 216, 99 S. Ct. 295, the latter relied upon by the ALJ in her order. In both *Furnco* and *Sweeney*, the Supreme Court directly addressed the burden of proof problem in disparate treatment cases, reaffirming its adherence to the three-step analysis in *McDonnell Douglas*. In each case, however, the court's language failed to enunciate a rule which lower courts could apply consistently. See Mendez, *Presumptions of Discriminatory Motive in Title VII Disparate Treatment Cases*, 32 Stan. L. Rev. 1129, 1130 (1980).

In *Furnco*, the court stated: "[I]t is apparent that the burden which shifts to the employer is merely that of *proving* that he based his employment decision on a legitimate consideration, and not an illegitimate one such as race." (Emphasis added.) (*Furnco Construction*

*Corp. v. Waters* (1978), 438 U.S. 567, 577, 57 L. Ed. 2d 957, 967-68, 98 S. Ct. 2943, 2950.) The *Furnco* court also repeated the language of *McDonnell Douglas*, stating, "To dispel the adverse inference \*\*\*, the employer need only 'articulate some legitimate, nondiscriminatory reason for the employee's rejection,' " (438 U.S. 567, 578, 57 L. Ed. 2d 957, 968, 98 S. Ct. 2943, 2950.) While the *Furnco* court made clear that proof of the *prima facie* case imposed some burden on the employer to come forward with evidence to dispel the "adverse inference," it was unclear whether the burden was simply one of producing sufficient evidence to escape any adverse directed verdict of or producing sufficient evidence to persuade the trier of fact of the lawfulness of the action. 32 Stan. L. Rev. 1129, 1134 n.30 (1980).

Five months later in *Sweeney*, the court, in a *per curiam* decision, held that the First Circuit had erred in requiring an employer to *prove* absence of discriminatory motive to rebut the *prima facie* case. It further stated that: "[w]hile words such as 'articulate,' 'show,' and 'prove,' may have more or less similar meanings \*\*\* we think that there is a significant distinction between merely 'articulat[ing] some legitimate, nondiscriminatory reason' and 'prov[ing] absence of discriminatory motive.' " *Board of Trustees v. Sweeney* (1978), 439 U.S. 24, 25, 58 L. Ed. 2d 216, 218-19, 99 S. Ct. 295, 295.

Finally, in *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089, the Supreme Court clarified the level of proof necessary for the employer to rebut the *prima facie* presumption:

> "It is sufficient if the [employer's] evidence raises a genuine issue of fact as to whether it discriminated against the [employee]. To accomplish this, the [employer] must clearly set forth, *through the introduction of admissible evidence*, the reasons for the [employee's] rejection. The explanation provided must be legally sufficient to justify a judgment for the [employer]. If the [employer] carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." (Emphasis added.) 450 U.S. 248, 254-55, 67 L. Ed. 2d 207, 216, 101 S. Ct. 1089, 1094-95.

The employer's admissible evidence must allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus. (450 U.S. 248, 257, 67 L. Ed. 2d 207, 217-18, 101 S. Ct. 1089, 1095-96.) The *Burdine* court did not believe that limiting the employer's evidentiary obligation to a burden of production would unduly hinder the employee, because "the [employer's]

explanation of its legitimate reasons must be clear and reasonably specific." 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096.

In the present case, plaintiff contends that the ALJ erred as a matter of law when she held that Supervisor Storey's testimony concerning his beliefs and opinions was inadmissible hearsay. Plaintiff cites *Jones v. Los Angeles Community College District* (9th Cir. 1983), 702 F.2d 203, and *Ostroff v. Employment Exchange, Inc.* (9th Cir. 1982), 683 F.2d 302, for the proposition that hearsay may articulate a legitimate reason for discharge, and posits that evidence of Storey's conversations with Coppage and Pitts was offered to show the *basis* upon which he made his recommendation to terminate Pitts. Plaintiff reasons that the conversation should serve to constitute an articulated "legitimate nondiscriminatory reason" under *Burdine*. We disagree.

■ We believe that the ALJ properly considered the nonhearsay purpose of Storey's testimony (see *Jones v. Los Angeles Community College District* (9th Cir. 1983), 702 F.2d 203; and *Ostroff v. Employment Exchange, Inc.* (9th Cir. 1982), 683 F.2d 302) regarding the basis for Pitts' discharge as being his conversation with foreman Coppage, but rejected the testimony as "incoherent" when (1) Coppage denied ever discussing Pitts' performance with Storey and (2) Storey admitted that he did not get the opportunity to speak with Coppage about the blender breakdown until after Pitts was discharged. Given the overwhelming disavowal at hearing of Storey's earlier version of the discharge, we conclude that plaintiff failed to raise even a genuine issue of fact concerning Storey's basis for terminating Pitts, and so fell short of the *Burdine* standard.

By the time that plaintiff presented its own case, Storey had recanted his earlier position that his basis for Pitts' discharge was his conversation with Coppage, and had offered a new position that Storey's basis for Pitts' termination was a "series" of events. This generalized "series" of events certainly was not "clear and reasonably specific" enough to meet the *Burdine* standard.

Our careful scrutiny of the entire record reveals that the ALJ understood the limited purpose of hearsay evidence, and that she admitted such evidence for such purposes. For example, the ALJ analyzed a business records objection thus:

> "I think a big distinction has to be made between the actual information on which the company thinks its decision is based and what they knew at the time.
>
> * * *
>
> I think that you're entitled [to admission of the business record]

because employers necessarily don't always base all their employment decisions on first-hand information. To state, 'Well, I got this information from Joe Jones,' and that sort of thing is entirely appropriate. But I think you've got to distinguish that from the contents itself. The contents itself is something that the right of cross-examination has to be reserved on very carefully.

\* \* \*

It's a two-step process, and I don't have any trouble with that because I realize that's a problem big employers have. The bossman doesn't see everything, and that's perfectly understandable. That sort of evidence does come in. But I have trouble with the hearsay aspect of the rest of it."

From the analysis above, it is clear that the ALJ did not place an improper burden upon plaintiff—to prove that Pitts burned out the motor; rather, the ALJ sought credible testimony to establish Storey's *basis* for recommending Pitts' discharge, and clearly did not find it.

■ Therefore, Storey's reason becomes unclear and does not raise a genuine issue of fact under *Burdine* so as to rebut Pitts' *prima facie* case. Although the ALJ's phrasing was somewhat strong, we believe the proper legal standards were actually applied, and find that neither the ALJ nor the Commission and circuit court erred as a matter of law. Since the employee's *prima facie* case stands in the absence of plaintiff's articulated nondiscriminatory reason, judgment must be affirmed. *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 254, 67 L. Ed. 2d 207, 216, 101 S. Ct. 1089, 1094.

■ Assuming *arguendo* that the ALJ erred as a matter of law in her determination that plaintiff failed to articulate a "legitimate nondiscriminatory reason" for its discharge of Pitts, we believe that the judgment must be affirmed on the basis of the alternative finding that plaintiff's proffered explanation was pretextual. (See *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817.) Plaintiff presented no evidence that the blender's motor burned out on January 15, 1979, yet there was testimony that a fuse had been removed from the motor prior to Pitts' shift. Removal of the fuse from the blender would render the motor inoperable, negating any possibility that Pitts burned out the motor on his shift. In addition, a motor continued to burn out after Pitts left plaintiff's employ. With reference to other discharges for motor burnouts, it is clear that Mr. Garcia was never disciplined nor discharged for his role in a previous burnout. In addition, Mr. Ratliff testified that the blender broke

down on January 14, 1979, during Mr. Gonzalez' shift, yet only Pitts was discharged.

In light of the foregoing, we find that the Commission and circuit court's determination that plaintiff discriminated against Pitts on the basis of his race was not contrary to the manifest weight of the evidence. See *Eastman Kodak Co. v. Fair Employment Practices Com.* (1981), 86 Ill. 2d 60, 76, 426 N.E.2d 877.

For the foregoing reasons, the order of the trial court affirming the decision of the Human Rights Commission is affirmed.

Affirmed.

MEJDA, P.J., and SULLIVAN, J., concur.