ROBERT LIPSEY, Plaintiff-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Defendants-Appellees.

First District (5th Division)   No. 85—0159

Opinion filed July 2, 1987.

LORENZ, J., dissenting.

Shelly Waxman, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill Wine-Banks, Solicitor General, and Edward M. Kay, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Human Rights Commission.

James D. Montgomery, Corporation Counsel, of Chicago (Mary K. Rochford and Robert L. Janega, Assistant Corporation Counsel, of counsel), for appellee Chicago/Cook County Criminal Justice Commission.

JUSTICE PINCHAM delivered the opinion of the court:

After plaintiff, Robert Lipsey, was discharged from his employment as an assistant planner with the Chicago/Cook County Criminal Justice Commission (CJC) because of "problems and attitude," he filed a complaint of racial discrimination with the Fair Employment Practice Commission (FEPC), now known as the Human Rights Commission (Commission) (Ill. Rev. Stat. 1985, ch. 68, par. 1—101 *et seq.*). Following an evidentiary hearing, an administrative law judge of the Commission entered an order and decision which found, *inter alia*, that the CJC did not discharge plaintiff because of problems and attitudes, but rather the CJC discharged plaintiff because he opposed the CJC's racially discriminatory practices and that the CJC committed an unfair employment practice in so doing. The Commission's administrative law judge ordered plaintiff reinstated to his employment with CJC. A three-member panel of the Commission reversed the finding and decision of the Commission's administrative law judge, finding that there was no substantial evidence that CJC had discriminated against plaintiff because of his race. On administrative review the circuit court of Cook County affirmed the Commission's decision.

In his appeal from that decision plaintiff contends that the Commission erred when it reversed the order and decision of the administrative law judge who found that the CJC had terminated plaintiff because of his opposition to racially discriminatory practices and that the circuit court erroneously affirmed the Commission's decision of reversal.

The testimony presented during the evidentiary hearing before the Commission's administrative law judge established that the CJC is an agency of the City of Chicago and County of Cook which awards State and Federal funds to community organizations and other government agencies to finance their criminal justice programs. On July 7, 1977, Daniel O'Connell, the executive director of the CJC, hired plaintiff as an assistant planner and assigned him to work on the co-

ordinating community council. According to Director O'Connell, who had a baccalaureate degree and had attended but had twice withdrawn from law school, plaintiff was paid 8% more than other assistant planners because plaintiff was a law school graduate. The evidence further revealed that plaintiff was multilingual and that one of the languages he spoke, in addition to English, was Spanish. The CJC had 23 employees, seven of whom were supervisors, and the remainder of the staff was composed of secretaries, planners or assistant planners. Employees were prohibited from obtaining secondary employment unless it was approved by Director O'Connell. Further, nonsupervisory employees were required to sign time sheets whenever they arrived or left the workplace, to submit memoranda to explain tardiness or absence, and to report weekly on all the projects on which they had worked. Employees were given a "special leave" of three days for the funeral of a family member so long as the employee had provided his supervisor with prior notice. Supervisors were authorized to reprimand nonsupervisory employees and to assign work to them. Reprimands could be issued orally or in writing. There were two types of written reprimands: one advised the employee of the infraction he had committed and the other provided that same advice but in addition gave notice that if the infraction was repeated the employee would be discharged. Nevertheless, the executive director had the sole power to discharge an employee and always approved suspensions.

Plaintiff's immediate supervisor was John Kurtovich, who reported to Margaret Leslie, the assistant to Director O'Connell. Both Leslie and Kurtovich had baccalaureate degrees. Plaintiff testified that his position was a "political job" which he had obtained through an alderman. Plaintiff's duties included writing reports on community criminal justice programs and legislation. Also, as a staff member of the coordinating community council, plaintiff was required to chauffeur supervisors, to wash their cars and to deliver their packages. During the course of his employment, plaintiff frequently asked for more challenging work which would utilize his academic and racial background and fluency in Spanish.

On August 16, 1977, plaintiff left for lunch at 1:15 p.m. He was required to return at 2:15 p.m. However, he returned at 2:53 p.m. and failed to sign the time sheet. When a secretary/timekeeper brought plaintiff's commission to his attention, plaintiff indicated on the time sheet that he had returned from lunch at 2:30 p.m. Margaret Leslie then reprimanded plaintiff for the inaccuracy and plaintiff corrected the time to 2:53 p.m. On the following day Leslie issued the following

written memorandum to plaintiff regarding his tardiness and office records:

"On August 16, 1977, you were considerably late returning from lunch. This alone violates office policy, in that daily lunch hours would be confined to 60 minutes. Any deviation from this policy, for personal and/or other reasons, must first be brought to the attention of your supervisor or the Executive Director, for approval.

Upon return from lunch you had not signed in until 3:50 P.M. when you were requested to. At that time you indicated your return from lunch as 2:15 P.M. Shortly thereafter, you changed the alleged time of your return on the time sheet from 2:15 to 2:45.

The gravity of this matter lies in the fact that you recorded an inaccurate time of return on the office records, on two occasions. These records are official authorization of an employee's time in the office and should not be treated lightly. It is imperative that all time recorded be absolutely accurate. False recording cannot and will not be tolerated.

The seriousness of your actions would normally require disciplinary action; in the form of suspension from the office for up to three days. Considering you are a relatively new employee and although you have been made aware of the realities regarding the application of time sheets and their official use, you have not had any previous violations of office policies, I am therefore not recommending disciplinary action be taken at this time.

I am however submitting this warning to serve as an official reprimand. I would hope that this would suffice as a deterrent from further violations.

Should an action of this nature occur again in the future, I will have no alternative than to recommend immediate disciplinary action."

The record reflects that a copy of this memorandum was also sent to Director O'Connell.

On September 28, 1977, plaintiff was suspended for being insubordinate to his immediate supervisor, John Kurtovich. The events which precipitated his suspension are as follows: On September 16, 1977, plaintiff learned that his grandmother had died in Mississippi. Plaintiff then told Margaret Leslie and other co-workers of the death and that he would attend the funeral. Leslie advised Director O'Connell of the death and the latter extended his condolences to plaintiff through

Leslie. Plaintiff was absent from work for the next three days. During that time Kurtovich spoke with plaintiff's wife. When plaintiff returned, Kurtovich asked him why he had not given him notice that he would be absent. Plaintiff replied that because Kurtovich had not been available plaintiff had notified Leslie. Kurtovich then ordered plaintiff to prepare two separate memoranda to explain why he had not given Kurtovich notice and why he had taken three days "special leave" for the funeral. Plaintiff then asked Kurtovich why two separate memoranda were required. According to Kurtovich, plaintiff became argumentative and was insubordinate. A co-worker who observed the incident testified that he had been impressed by the way plaintiff "handled himself" and did "not raise his voice but was getting his answers like in court" from Kurtovich. Margaret Leslie then issued the following memorandum suspending plaintiff for three days:

"As a result of the incident on Thursday, September 22, 1977, involving yourself and your immediate supervisors, I feel disciplinary action is in order.

The altercation which occurred in the presence of other staff members, cannot be tolerated. The uncooperative *** attitude which you *** pursued is not constructive and will not permit a healthy contribution to this office.

Your conduct was unbecoming an employee of this Commission. Your attitude and demeanor do not promote a responsible and professional office atmosphere and are conducive to insubordination. On this occasion as well as previous occasions, your attitude has been undesirably reluctant and has been less than satisfactory for a Commission employee.

Therefore, I am hereby notifying you of your immediate suspension from this office, for a three day period."

On January 25, 1978, plaintiff applied for a higher position and a raise. Both requests were denied by Director O'Connell based on a recommendation from Margaret Leslie.

On March 31, 1978, plaintiff submitted a work schedule to John Kurtovich which indicated that plaintiff had worked two days on which plaintiff had been absent. Kurtovich issued a memorandum to plaintiff which reprimanded him for the error and advised plaintiff that a copy of his memorandum would be sent to the executive director and placed in plaintiff's personnel file and that "if this problem continues I will have no alternative but to request disciplinary action from Mr. O'Connell."

In a memorandum of April 4, 1978, John Kurtovich requested that Director O'Connell take disciplinary action against plaintiff for his

submission of the aforementioned work schedules. The memorandum was as follows:

"As you know from our discussion on Friday morning, March 31, 1978, I've been having problems with Robert Lipsey of my staff, regarding submission of memorandums relating to office policy and weekly work schedules. In addition to his not submitting these work schedules, I have found that even when submitted late, they have been incorrect. I've had to return his last two work schedules because he has indicated working on assignments for days he didn't even report for work.

I've discussed this problem with Mr. Lipsey and have informed him in writing that continued misreporting of his work product will lead to my request for disciplinary action.

Tuesday, April 4, 1978, Mr. Lipsey submitted his work schedule for the period of March 27 through 31, 1978. Once again he has failed to produce an accurate report of his time worked. On this report, he has listed a seven hour day, 9 A.M. to 5 P.M., for data coding at the Chicago Police Department on Monday, March 27, 1978, while in fact he didn't even report to work on that day. Furthermore, he has submitted a request for sick pay for that day.

As Mr. Lipsey's supervisor and the person responsible for reviewing his work schedules and approving the acceptance of them, I must raise question to these repeated excusable actions. It's becoming obvious to me that Mr. Lipsey cares little for our office policy or my authority as his supervisor and I would like to request that you, as Executive Director, take the necessary action needed, including suspension, to resolve this problem once and for all."

A copy of Kurtovich's April 4, 1978, memorandum "Request for Disciplinary Action" was submitted to Margaret Leslie and seven days later Margaret Leslie issued to plaintiff the following memorandum regarding weekly work schedules:

"It has come to my attention on repeated occasions that the accuracy of your work schedules leaves much to be desired.

I feel it is necessary to remind you of the need for accurate and informative accounts of work activities. As I have personally informed you on more than one occasion these work schedules serve as a record of an employee's activities, and as a guide for the supervisor in judging the level of an employee's ability and competency. They are to be maintained continually and in an accurate, complete and professional manner.

Your work schedules are not only inaccurate in certain instances, but they are also unprofessional and of poor quality.

Certainly errors can be made and can be corrected. However, it is the level of quality and professionalism which is important and when this is not evident on simple work reports, I hesitate to believe the necessary level of quality is being achieved in other work products."

A copy of this memorandum was also submitted to Director O'Connell.

On April 10, 1978, Executive Director O'Connell instructed Margaret Leslie to request nonclerical employees to prepare memoranda regarding their "duties, responsibilities, needs and activities." Twenty staff members submitted memoranda, including plaintiff, who at 10:30 a.m. on the following day, submitted the following memorandum to Leslie, and proceeded to another assignment at the police department:

"Activities presently involved:

I am currently involved in evaluating data for the aggravated assault study. The task is somewhat tedious, to say the least, but very informative. During these past few weeks I have learned a great deal about the Chicago Police Department and how it operates. I now have a better understanding of the connection between the Chicago Police Department, the State's Attorney's Office and the Courts.

Needs as a Staff person:

As an employee of the Chicago-Cook county Criminal Justice Commission my immediate needs are very basic, *i.e.*, *money*. Based on my educational background, *i.e.*, a law degree, the ability to converse fluently in three different languages, also an instructor in criminal law, I feel that I am *severely [sic] underpaid*. Frankly speaking Dan, and I know you are aware of this, if my skin was a different color there is no question that I would receive top wages. Also, as a staff person, I need to be placed in a position where I can exercise these qualities. Throughout this whole Criminal Justice System, especially where the vast majority of the crimes are committed by Blacks and Latinos, or persons of Spanish descent, it seems inconceivable that my skills cannot be better utilized than they are at present.

My Special interest:

I am especially in working with the courts, community groups, the police department, etc. With the large Spanish pop-

ulation we have in Chicago coupled with my legal background and my ability to speak Spanish fluently, I certainly hope that through your influence, my service will be better utilized in the future.

Sincerely,

Robert Lipsey"

When plaintiff returned from his assignment at the police department at 4:30 p.m. Margaret Leslie told plaintiff that Director O'Connell wanted to talk to plaintiff about his memorandum. Plaintiff explained that he would be late for a Russian language class he was taking. Leslie asked plaintiff what was the meaning of the following sentence in his memorandum:

"Frankly speaking Dan, I know you are aware of this, if my skin were a different color there is no question that I would be receiving top wages."

Plaintiff replied that his meaning was clear. Shortly thereafter plaintiff, Leslie, John Kurtovich and Wilborn Kelly attended a meeting with Director O'Connell, who asked plaintiff to explain the meaning of the aforementioned sentence. Plaintiff stated that he was late for his language class and that his "5 year old" could understand the meaning of the sentence. Director O'Connell testified that:

"And several of us supervisors tried to determine whether we knew what he was saying by that reference, whether he was suggesting a problem in society that unfairly effected [sic] blacks or some illegal action on the part of the Commission and/or its administrators.

If he was suggesting the latter—and we really weren't sure—we certainly would want to identify the problem and be sure that this very sensitive Commission was implementing the law of the land."

Director O'Connell suspended plaintiff for two days without pay and told him to think about his continued employment at the CJC.

The following day, April 12, 1978, Margaret Leslie issued the following suspension memorandum to Director O'Connell regarding the incident:

"As requested, I am submitting an account of the incidents which resulted in the suspension of Robert Lipsey, one of my staff members, yesterday, for a two-day period beginning Wednesday April 12, 1978 through Thursday April 13, 1978. On Monday, April 20, 1978 you called a meeting of supervisors. At this meeting you instructed us to request each of our team members to submit a brief handwritten memo indicating the

activities in which they are currently involved, office needs which from their prospective they see as evident and their special interests.

John Kurtovich and I so instructed our staff and had received all memos by 10:30 A.M. Tuesday, April 11, 1978. At approximately 3:00 P.M. Tuesday, John and I met with you regarding the completed memos. We called your attention to Bob Lipsey's memo (attached) in particular and his response to the suggestion for office needs. Briefly, his response indicated that he needed more money. He wrote that he was severely underpaid and if his skin were of a different color he would be receiving top wages, because of his education and other capabilities.

After considerable discussion it was determined that our impressions were the same and that he was alleging that this office and you were discriminating against him because of race. You directed me to speak with him and ascertain what he meant by his statement. You also said that if his explanation was similar to our impression, you wanted to speak with him.

At 5:00 P.M. I called Bob into my office and asked him to tell me what he meant by his statement, which I read aloud. He said he meant just what he wrote, he thought it was perfectly explicit and he couldn't elaborate any further. He further said his child could understand it and he couldn't understand why I didn't. He also said he was sure that he was the only staff person that was being questioned about what they wrote.

After asking him several more times to please explain, he agreed and stood up to leave. I told him I wanted him to explain now and he said it was after 5 he wasn't working and couldn't elaborate anyway. At this point, I asked him to wait while I spoke to you. You said you wanted to speak to him shortly, which I told him.

He indicated that he couldn't stay because he had a class. I told him to wait you wanted to see him and it wouldn't take long.

Bob Lipsey, John Kurtovich, Wil Kelly and I went into your office. You asked Bob for an explanation. He said what he wrote was explicit and that's what he meant. You asked if he was charging the office and yourself with discrimination and he responded that what he was saying was what he had written. You suggested that he consider looking for another job where he would get paid for his educational degrees. You asked him

why he hadn't spoken to you about his concerns before writing them and he said he tried when he submitted his memo for his step-increase. He said he submitted his request and didn't hear anything for a month and was then denied. You asked if he had been told he could speak to you about it. He said no. You said 'isn't it true that Margie Leslie told you her recommendation was to deny the request and if you had any problems with that you could speak to me about them.' I agreed that that was absolutely correct.

You then informed Bob that what he had written and the manner in which he chose to present his salary problem was unprofessional and done in an improper manner. You said he was suspended for two days beginning Wednesday, April 12 through Thursday, April 13. You suggested that he spend the time giving serious thought to the practicality of his continued employment in this office. You told him that upon his return Friday morning we would discuss whether or not to continue his employment and if so under what conditions."

When plaintiff returned to work Director O'Connell asked him if he had decided to retract his statement. Plaintiff refused to retract his statement and O'Connell terminated him.

■ Before we address the contentions raised by plaintiff on appeal, we first consider defendant's claim that plaintiff's brief does not comply with the supreme court rules and that plaintiff's appeal should therefore be dismissed. More specifically, defendant argues that plaintiff's statement of facts is incomplete and his argument lacks proper citation to authorities. Although plaintiff's brief is somewhat deficient, the complete record is before us and a cogent legal argument is discernible. In the interest of justice, we will consider the merit of plaintiff's appeal. *Luethi v. Yellow Cab Co.* (1985), 136 Ill. App. 3d 829, 832, 483 N.E.2d 1058.

■ Factual determinations by an administrative agency are *prima facie* correct and may be set aside upon review only if they are against the manifest weight of the evidence. (*Clark Oil & Refining Corp. v. Golden* (1983), 114 Ill. App. 3d 300, 307, 448 N.E.2d 958.) In reviewing the Commission's decision, we must determine whether it was arbitrary, capricious or an abuse of discretion. (*Barnes v. Barbosa* (1986), 144 Ill. App. 3d 860, 864, 494 N.E.2d 619.) Under the Human Rights Act (Act) (Ill. Rev. Stat. 1985, ch. 68, par. 1—101 *et seq.*) the plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of unlawful discrimination. Once the plaintiff has satisfied that burden of proof, the employer may rebut it by pre-

senting a legitimate nondiscriminatory reason for its employment decision. If the employer carries this burden, the presumption of unlawful discrimination is abrogated and plaintiff must prove by a preponderance of the evidence that the reason offered by the employer was a pretext. (*Valley Mould & Iron Co. v. Illinois Human Rights Com.* (1985), 133 Ill. App. 3d 273, 281, 478 N.E.2d 449.) It is a civil rights violation for any employer to discharge an employee on the basis of race. (*Department of Corrections v. Clay* (1985), 135 Ill. App. 3d 710, 713, 481 N.E.2d 1080.) The central focus of the inquiry in a discrimination case is whether, when the evidence is evaluated in the light of common experience, it shows that the employer is treating some employees less favorably because of, for example, sex. (*Board of Education v. Illinois Fair Employment Practices Com.* (1979), 79 Ill. App. 3d 446, 452, 398 N.E.2d 619.) Section 2—102(A) of the Act states:

"Civil Rights Violations—Employment. It is a civil rights violation:

(A) Employers. For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." Ill Rev. Stat. 1985, ch. 68, par. 2—102(A).

■ The standard of review for an administrative decision regarding discharge is whether it was contrary to the manifest weight of the evidence. (*Department of Mental Health & Developmental Disabilities v. Civil Service Com.* (1981), 85 Ill. 2d 547, 550, 426 N.E.2d 885.) If there is any evidence in the record that supports an administrative agency's decision, that decision was not contrary to the manifest weight of the evidence and must be sustained on judicial review. *Fagiano v. Police Board* (1984), 123 Ill. App. 3d 963, 974, 463 N.E.2d 845.

Our review of the instant record establishes that plaintiff was employed by the CJC from July 7, 1977, until April 14, 1978. During that period he was reprimanded by a supervisor for failing to accurately report the time he returned from lunch, to notify his immediate supervisor of his intended three-day absence because of a death in plaintiff's family and to submit an accurate work schedule. Although each of these incidents resulted in the issuance of disciplinary memoranda, none of them warned plaintiff that discharge was likely to follow. Further, the record clearly established that the issue of discharge did not arise until plaintiff complained that the CJC had engaged in racially discriminatory practices in his memorandum of April 11,

1978, which he had prepared following the instructions of Margaret Leslie. Although in that memorandum plaintiff indicated that he had a position as an instructor in criminal law, his testimony disclosed that he had received no remuneration for teaching but that he had taught on a voluntary basis. Further, although plaintiff testified that when he was hired by the CJC he had a part-time teaching position for which he was paid, he discontinued that position in the fall of 1977. Additionally, plaintiff's teaching positions were never raised as a ground for disciplinary action in Margaret Leslie's memorandum of April 12, 1978, or during the week regarding the memorandum.

According to the testimony and Margaret Leslie's memorandum of April 12, 1978, Director O'Connell requested a memorandum from plaintiff and other nonclerical staff members to obtain their views regarding the "activities in which they are currently involved, office needs which from their perspective they see as evident and their special interests." Even though the director may have disagreed with plaintiff's opinion regarding discriminatory practices and may have been concerned about plaintiff's perception of the CJC, that was not a sufficient basis to terminate plaintiff. The record does not indicate that plaintiff's belief disrupted the functioning of the office or in any way hindered productivity. Attention was focused on the memorandum because, in part, it accused the CJC of considering an employee's race in making employment decisions. The evidence supported the finding that plaintiff's race and his complaint of disparate treatment based on race were the basis of his discharge. See *Board of Education v. Illinois Fair Employment Practices Com.* (1979), 79 Ill. App. 3d 446, 452, 398 N.E.2d 619.

We note that while the trial judge affirmed the decision of the three-panel Commission, the trial judge observed that "there is a fellow with a bad record but they don't fire him because he had a bad record, they fire him because he answered a thing and he wouldn't retract [sic] it. *** This is the first case I had where the Human Rights Commission reversed their own hearing officer."

■ We believe that plaintiff presented sufficient evidence to establish a *prima facie* case of discrimination. As we have indicated, plaintiff was employed by the CJC 10 months. During that period he was disciplined for inaccurately completing a time sheet and work schedule, and for failing to notify his immediate supervisor that he would take a three-day leave for the out-of-State funeral of plaintiff's grandmother. With regard to discharge, the CJC had the policy of issuing written warnings to employees that they would be discharged if they repeated conduct for which they had been reprimanded. How-

ever, no such notice of termination was issued to plaintiff with any of his three reprimands. On April 11, 1978, plaintiff submitted the memorandum regarding working conditions at the CJC to his supervisor pursuant to her request. Among the statements included in the memorandum was plaintiff's complaint about racially discriminatory practices at the CJC. Because plaintiff refused to retract that portion of the memorandum he was discharged. The facts herein clearly established that plaintiff's discharge was based on his complaint of racially motivated conduct at the CJC and his refusal to retract his complaint about it. Although we note that the supervisors testifying on behalf of the CJC suggested that plaintiff had been incompetent, they had not reprimanded plaintiff for incompetency but, rather, for violating office rules of procedure. Thus, we believe that the administrative law judge's decision that the evidence clearly showed that the CJC's grounds for plaintiff's discharge were pretextual and insufficient was proper. Because of our disposition of this issue we need not consider plaintiff's remaining contention.

Accordingly, we reverse the judgment of the circuit court and remand this cause for entry of an order requiring the Commission to enter a finding of substantial evidence of discrimination and for further proceedings in conformity with this opinion and the Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, par. 1—101 *et seq.*).

Reversed and remanded.

JIGANTI, J., concurs.

JUSTICE LORENZ, dissenting:
In this administrative review action we are obliged to affirm the finding of the administrative agency, the Illinois Human Rights Commission, unless we determine that "all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous" and that the opposite conclusion is evident. (*Daniels v. Police Board* (1976), 37 Ill. App. 3d 1018, 1023, 349 N.E.2d 504, 508.) Because I believe that the plaintiff-appellant has utterly failed to meet this heavy burden, I must respectfully dissent from the majority's decision to overturn the findings of the Commission.

The Commission found that the plaintiff was terminated because of insubordination and a poor work record. A review of the record on appeal (a review made exceedingly difficult by the completely inadequate statement of facts presented by plaintiff in his brief) establishes the

following. In the nine months that the plaintiff worked for the CJC he repeatedly violated the CJC's rigid timekeeping requirements, requirements necessitated by strict Federal and State scrutiny of the CJC. In August 1977 plaintiff was reprimanded in writing for omitting and then incorrectly entering the time he returned for lunch. In September 1977 he became abusive and argumentative when questioned by a superior about a request to prepare two memoranda concerning three workdays he missed while attending the out-of-town funeral of his grandmother. He received a three-day suspension for this. In March 1978 plaintiff incorrectly filled out his work sheets, listing a half-day meeting as taking a full workday, claiming to have worked on a day he called in sick, and providing an incorrect description of work he performed on five other days. Even after being instructed to correct these errors plaintiff again reported that he had worked on a day on which he had not worked and for which he had requested sick pay. As the result of these errors a review was conducted of plaintiff's work record for January 2, 1978, to April 7, 1978. It was established that over one-third (140 hours) of the hours of work reported by plaintiff for that period were for projects which in fact were not assigned to plaintiff and for which he had produced no results.

Plaintiff, along with other employees, was then asked to prepare a memorandum listing his work schedule, the needs of the office and his special interests. One reason for the request was that plaintiff's superiors were attempting to determine whether plaintiff should be retained but with different work assignments. Plaintiff submitted a memorandum stating that based, *inter alia*, on his law degree and his status as an instructor in criminal law, he was severely underpaid. In fact, the record establishes that when hired the plaintiff was paid 8% more than he ordinarily would have been paid because of his legal education. However, by the time plaintiff submitted his memorandum he had flunked the Illinois bar examination twice. The instruction position referred to in the memo was in violation of an office policy requiring written approval for secondary employment. CJC's executive director, Daniel O'Connell, testified that the day plaintiff was hired plaintiff was given time off to go resign from this other job. Plaintiff denied that occurrence but admitted that he never obtained permission for the secondary employment. Indeed he stated he first disclosed that job in his memorandum.

In the same memorandum plaintiff also stated "if my skin were of a different color there is no question that I would be receiving top wages." Daniel O'Connell testified that he reacted to the memorandum with confusion, suspicion and disappointment. He sought to ques-

tion plaintiff about the specifics of the race discrimination charge. Despite repeated requests plaintiff would not elaborate, stating only that a child could understand the comment. O'Connell testified that he considered this to be unprofessional behavior and he suspended plaintiff for two days, telling him he should consider whether he wished to continue his employment. Upon his return to work plaintiff stated he had no intention of leaving his employment. However O'Connell told him that after a review of his statement he had decided to fire him. O'Connell testified that plaintiff was in "serious trouble" even before the incident with the memorandum. He believed plaintiff would have been fired even if the memorandum had not existed. The CJC subsequently hired a black woman to replace the plaintiff.

All of this evidence amply supports the finding of the Commission that plaintiff was fired for insubordination and a poor work record. Certainly it does not support the majority's bald conclusion that plaintiff was discharged because of his race. Accordingly, I dissent.